# Illinois Official Reports

## Appellate Court

---

### *People v. Feliciano*, 2020 IL App (1st) 171142

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GILBERT FELICIANO, Defendant-Appellant. |
| District & No. | First District, Second Division<br>No. 1-17-1142 |
| Filed | October 20, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CR-12693; the Hon. Stanley J. Sacks, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Jennifer L. Bontrager, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, David H. Iskowich, and Jessica L. Wasserman, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE PUCINSKI delivered the judgment of the court, with opinion.<br>Justices Lavin and Cobbs concurred in the judgment and opinion. |

**OPINION**

¶ 1        Following a jury trial, defendant Gilbert Feliciano was convicted of first degree murder, home invasion, and robbery and received consecutive prison sentences of 40 years for one count of first degree murder, 10 years for one count of home invasion, and 4 years for one count of robbery, totaling 54 years' imprisonment. On appeal, Feliciano argues (1) that the trial court erred in allowing the State to introduce inadmissible hearsay statements made by the victim, Stanley Letkiewicz; (2) that the trial court erred in allowing the State to introduce evidence regarding a confrontation between Feliciano, the victim, and one witness prior to the incident; and (3) that the State failed to prove him guilty beyond a reasonable doubt of first degree murder, home invasion, and robbery. We affirm.

¶ 2                                                    BACKGROUND
¶ 3        Feliciano was charged by indictment with 11 counts of first degree murder (720 ILCS 5/9-1(a)(1), (2), (3) (West 2010)), 2 counts of home invasion (*id.* § 12-11(a)(2)), 4 counts of residential burglary (*id.* § 19-3(a)), and 1 count of robbery (*id.* § 18-1(a)), following an incident in Chicago continuing from October 11 through October 13, 2010. Before the case reached trial, the State nol-prossed all counts except six counts of first degree murder, one count of home invasion, and one count of robbery.

¶ 4                          A. Motion to Admit Evidence—Spontaneous Declarations
¶ 5        Prior to trial, the State brought a motion to admit evidence of Letkiewicz's statements under the hearsay exceptions of forfeiture by wrongdoing, dying declaration, and spontaneous declaration. Later, the State withdrew its forfeiture by wrongdoing theory but proceeded on the other theories.

¶ 6        At an evidentiary hearing on the motion, the State called Letkiewicz's neighbor, Francisco del Angel, who testified that the City of Chicago had told Letkiewicz to clean the basement of Letkiewicz's house. Letkiewicz met Feliciano in a parking lot and told Feliciano that, if he helped clean the basement, Letkiewicz would pay Feliciano and let him stay in the basement. Feliciano moved into Letkiewicz's basement and lived there for about eight months.

¶ 7        On October 13, 2010, just before 9 p.m., Francisco's son called Francisco and told him Letkiewicz's window was open. Francisco approached Letkiewicz's house, saw the basement window was broken with a curtain hanging out, and noticed the light in Letkiewicz's bedroom was on. Then Francisco entered Letkiewicz's house with a spare key he received from Letkiewicz. He heard "mumbling" and "screaming" and entered Letkiewicz's bedroom to see Letkiewicz on the floor with a tall, six-drawer dresser on top of the left side of his body. Letkiewicz's eyes were swollen shut, his face was swollen and covered in dry blood, he was bleeding from his mouth and nose, his hands were shaking, and his arms were swollen and bruised. Francisco asked if Letkiewicz was okay, and Letkiewicz stated, "Gilbert did this to me, Frank. Gilbert did this to me. He took my wallet, my money. I want my money. I want my money." Francisco went outside, told his son to call the police, reentered Letkiewicz's house, and lifted the dresser off Letkiewicz. Letkiewicz repeated four or five times that "Gilbert had beat him up." The police and paramedics arrived five or six minutes after Francisco had found

- 2 -

Letkiewicz, and Letkiewicz stated about six or seven more times that "Gilbert had beat him up."

¶ 8    Chicago Fire Department paramedic Vicki Hernandez testified that, at about 9 p.m., she and her partner Mark Holiday arrived at Letkiewicz's house, which was "ransacked," "dirty," and had furniture and clothing scattered around. She found Letkiewicz in his bedroom with a bruised face and arms and dried blood around his mouth and nose. Hernandez and Holiday moved Letkiewicz out of his house. Holiday tested Letkiewicz's orientation using the Glasgow Coma Scale test, and Letkiewicz received a perfect score, but Hernandez could not remember whether the test was performed in her presence. Letkiewicz told Hernandez and Holiday multiple times that "Gilbert beat him up."

¶ 9    On cross-examination, Hernandez confirmed that, when Letkiewicz said "Gilbert" beat him up, she could not remember whether she had asked Letkiewicz what happened to him and she did not overhear anyone ask Letkiewicz who injured him. She and Holiday did not test Letkiewicz for dementia or Alzheimer's disease.

¶ 10   Holiday corroborated Hernandez's testimony but added that they took Letkiewicz to the ambulance and ran tests on Letkiewicz. There, they found that Letkiewicz was responsive to questions, did not appear confused, and had a fully oxygenated brain. Holiday and Hernandez then took Letkiewicz to a hospital. Holiday stated that they also ran the Glasgow Coma Scale test to assess Letkiewicz's level of consciousness. On direct examination, he testified that Letkiewicz scored a perfect score of 15. On cross-examination, however, Holiday was presented with the Glasgow Coma Scale test results and confirmed that Letkiewicz received a score of 11, which was "still within the normal range." Holiday further confirmed that Letkiewicz received a 2 out of 5 as to verbal responses and that some of Letkiewicz's statements were "[i]ncomprehensible." Holiday confirmed that "incomprehensible" only meant that they could not understand Letkiewicz sometimes "because of a dialect or an accent." Letkiewicz also received a 5 out of 6 for motor responses, which meant he could feel pain and was responsive.

¶ 11   Chicago police officer Juan Alvarado testified that on October 13, 2010, at about 8:45 p.m., he and his partner, Officer Rolly Ramirez, arrived in the vicinity of Letkiewicz's house in response to a medical emergency call. Alvarado and Ramirez spoke with Francisco, who told the officers he had not seen his neighbor Letkiewicz for "several days" and "was concerned for his wellbeing." Francisco told Alvarado that, after seeing the broken basement window, he entered Letkiewicz's house and found Letkiewicz in his bedroom with a dresser on top of him.

¶ 12   Alvarado went to the ambulance outside Letkiewicz's residence and found Letkiewicz in "[s]evere medical condition," with "blood all over his face," a blanket over him, and an oxygen mask on his face. Alvarado entered the ambulance and asked Letkiewicz, "Who did this to you?" Letkiewicz removed his oxygen mask and stated, "Gilbert did." According to Alvarado, Letkiewicz appeared "[f]rail, *** exhausted, tired, and angry."

¶ 13   Dr. Alice Kim testified that just after 9 p.m. that night, she was working as a physician at the hospital where Letkiewicz was taken, and she treated Letkiewicz. Letkiewicz was "disheveled with multiple trauma [*sic*] to his face and his extremities," had dried blood in his mouth, "was covered in feces and urine," had "multiple facial fractures," had contusions throughout his body, and had a "contusion in his brain with some bleeding." Dr. Kim asked Letkiewicz what happened to him. Letkiewicz looked "upset and angry" and stated, "Gilbert did it." Dr. Kim testified that Letkiewicz was able to state his name and respond to questions

- 3 -

about his medical history and condition. He also appeared aware of what was going on and showed no signs of confusion. Additionally, Letkiewicz had no issues moving his limbs and appeared oriented to himself, his location, and "what was going on."

¶ 14 On cross-examination, Dr. Kim testified that Letkiewicz had both old and new bruises on his body. Under examination by the trial court, Dr. Kim clarified that the new bruises were on Letkiewicz's face and extremities and appeared to be "[o]ne or two days" old. However, Dr. Kim could not confirm how old the older bruises were, as doing so "would be very difficult to do with an elderly patient."

¶ 15 Erlinda Sibal testified that she was working as a nurse when she saw Letkiewicz in the emergency room. Letkiewicz's face was swollen on the left side; his left eye was swollen shut with an orbital fracture; he had "black and blue *** bruises" around his eyes, ears, arms, and one of his legs; and he had a "skin tear on his leg." Later that same night, Sibal spoke with Letkiewicz in the intensive care unit (ICU) and asked what happened to him. Letkiewicz responded, "I was beaten up by my caretaker, Gilbert," and said that "Gilbert" had taken $1400 from him. Sibal described Letkiewicz as "alert," "oriented," and responsive to questions. On cross-examination, Sibal confirmed that Letkiewicz was in the emergency room for four hours before going to the ICU.

¶ 16 The State rested.

¶ 17 The defense presented Dr. Matthew Galloucis, a psychologist, who testified that on January 11, 2010, Letkiewicz was admitted to the hospital with an inguinal hernia and an ankle fracture that resulted from a "mechanical fall" at home. On January 17, 2010, Dr. Galloucis evaluated Letkiewicz. Letkiewicz told Dr. Galloucis that he had a son who lives out of state. Letkiewicz also reported feeling "somewhat dysphoric," "sad," and "depressed," which "was likely related to the stress of his injuries, medical condition and hospitalization." Additionally, Letkiewicz told Dr. Galloucis that he "felt mixed up" and that "everything seems mixed up." Dr. Galloucis noted Letkiewicz had a "slowed speed of mental processing" but stated "that comes with age." Additionally, Dr. Galloucis noted that Letkiewicz had "some cognitive symptoms," had difficulty concentrating, and asked Dr. Galloucis to repeat himself multiple times. Dr. Galloucis did not conclude that Letkiewicz's executive functioning was impaired but "noted it as a point to be possibly concerned about." He testified that executive functioning refers to "things such as attention, higher order of things like problem solving, verbal abstract reasoning, *** cognitive flexibility, and *** more complex attentional process[es]."

¶ 18 Additionally, Dr. Galloucis testified that he left a note to rule out a potential diagnosis of dementia for Letkiewicz, but he did not conduct further assessment because he believed Letkiewicz was still experiencing residual symptoms of confusion from his recent surgery. Galloucis also stated that Letkiewicz required restraint at one point after surgery.

¶ 19 On cross-examination, Galloucis confirmed that he never evaluated Letkiewicz for dementia. He also confirmed that Letkiewicz's "speech was fluent," Letkiewicz had "basic verbal, receptive and expressive language functions within normal limits," he had "the fair ability to track and follow conversations," "[h]is thought processes were generally coherent and goal directed," and he "was oriented to person, place, time and situation."

¶ 20 Dr. Jan Wiacek, a physician, testified that he met with Letkiewicz at the hospital in July and October 2010. In July 2010, Dr. Wiacek noted that Letkiewicz had "a history of falls," as well as dementia with "encephalopathy," a term Dr. Wiacek defined as "pathology of the brain which comprise[s] our mental function." Dr. Wiacek also confirmed that "it was indicated" to

him that Letkiewicz had a daughter, contrary to Letkiewicz's prior statement to Dr. Galloucis that he had a son. On October 13, 2010, Dr. Wiacek noted that he had difficulty understanding Letkiewicz and that Letkiewicz had difficulty remembering his medication and "generally was forgetful."

¶ 21 On cross-examination, Dr. Wiacek confirmed that Letkiewicz was not discharged with a diagnosis of dementia, and he could not confirm that Letkiewicz specifically told him he had a daughter. Dr. Wiacek testified that it was not unusual for a 94-year-old man to be forgetful and that when evaluated Letkiewicz was "alert"; "competent"; and oriented to himself, his time, and his place. He also confirmed that Letkiewicz repeatedly took the Glasgow Coma Scale test and received high scores each time. As to his difficulty understanding Letkiewicz, Dr. Wiacek confirmed that it was not "unusual to have difficulty understanding somebody who had broken bones in his face and a mouth full of blood." On redirect examination, Wiacek testified that a patient with dementia can occasionally be oriented to person, time, and directions.

¶ 22 Dr. David Bordo testified that, in October 2010, he worked as medical director of the emergency department and as an emergency medicine attending physician when he treated Letkiewicz. He could not recall telling a detective sometime in 2011 that Letkiewicz was lucid.

¶ 23 Chicago police sergeant John Haniacek testified that on May 17, 2011, he worked as a detective and investigated Letkiewicz's case after Letkiewicz's death. He spoke with Dr. Bordo, who stated he "did not believe that [Letkiewicz] was lucid" when he treated Letkiewicz and that he believed Letkiewicz had told paramedics who beat him.

¶ 24 The parties then presented oral arguments on the State's motion.

¶ 25 The State summarized that it would like the circuit court to find admissible:

1. Letkiewicz's statements to Francisco at the scene, as spontaneous declarations and dying declarations;

2. Letkiewicz's statements to Hernandez and firefighter personnel, as well as "the son who was at the scene who could hear over the telephone that *** Gilbert did it," which Hernandez would testify to at trial, as spontaneous declarations and dying declarations;

3. Letkiewicz's statement to Alvarado at the scene, as a spontaneous declaration and dying declaration;

4. Letkiewicz's statement to Dr. Kim in the emergency room, as a spontaneous declaration, dying declaration, and statement made to receive medical treatment; and

5. Letkiewicz's statement to Sibal in the ICU, as a spontaneous declaration, dying declaration, and statement made to receive medical treatment.

¶ 26 The State asserted that, when Francisco found Letkiewicz underneath a dresser and asked if he was okay, Letkiewicz "immediately" stated, "Gilbert did this to me, Frank," and said that Feliciano took his money. The State also asserted that Letkiewicz was still upset, angry, and exhausted when he told Alvarado that Feliciano beat him and that Hernandez likewise heard Letkiewicz state that "Gilbert beat him up." In the emergency room, Letkiewicz was similarly "angry and upset" when he told Dr. Kim that "Gilbert did it." The State described Letkiewicz's condition, stating that he had "dried feces and urine on his clothing," dried blood in his mouth, "facial fractures," contusions, "bleeding on the brain," and "bruising all over his body." Dr. Kim had described Letkiewicz as "frail," "elderly," and "in critical condition." The State

asserted that this evidence regarding Letkiewicz's condition supported a finding of admissibility under the dying declaration and spontaneous utterance exceptions.

¶ 27     The State also acknowledged that Letkiewicz was in the emergency room for about four hours before he made his statement to Sibal in the ICU. Nonetheless, the State asserted that Letkiewicz's statements were all "made while the excitement of the event was predominant." The State moreover confirmed that Letkiewicz died 40 days after he was found under the dresser but argued it was "a reasonable assumption" that Letkiewicz thought his death was imminent when he made his statements. The State also argued that, while there was a lot of testimony regarding Letkiewicz's mental health, there was no substantive evidence showing Letkiewicz did not know what was happening. The State also argued that Letkiewicz's statement to Alvarado was not testimonial because it was made to an officer during an "ongoing emergency."

¶ 28     The defense asserted that Letkiewicz's statements were testimonial because they were made to prove past events for later prosecution and so the trial court could not reach the question of whether any hearsay exceptions or exemptions apply. The defense also cast doubt on whether Letkiewicz believed he was dying when he made the statements and noted that Letkiewicz lived for 41 more days after the incident. As to Letkiewicz's mental health, the defense emphasized that, in July 2010, Dr. Wiacek noted that Letkiewicz had "dementia with encephalopathy," which was "a pathology of the brain which comprises our mental function." Further, the defense argued that in January 2010 Letkiewicz had reported that he had a son living out of state but in July 2010 reported that he had a daughter.

¶ 29     As to the State's spontaneous declaration argument, the defense asserted that Letkiewicz had been left under the dresser "for a while" and so "the startling occurrence was long over." The defense argued that Letkiewicz "was in pretty good shape for a 94-year-old man to be able to lay there for a couple of days and then live" and that his "injuries were not quite that bad." Additionally, the defense claimed there was no evidence of Letkiewicz's frailty.

¶ 30     The trial court found that the statements made to Francisco, Hernandez, Holiday, Alvarado, and Dr. Kim were admissible under the spontaneous declaration exception. The court observed that the event of being trapped under the dresser was "horribly startling" and there was "no way for [Letkiewicz] to know how it's going to play out." The court viewed the startling event as the entire time during which Letkiewicz was trapped under the dresser and found there was no time for Letkiewicz to fabricate his story from the moment the dresser was lifted off of him to the moment he made his statements. Letkiewicz was also still upset by the time he made the statements to Dr. Kim. The court observed that the startling occurrence continued for a "long, long time" and "continue[d] to perpetuate itself."

¶ 31     The court also found that Letkiewicz's statements were not testimonial. As to the statements made in response to Alvarado's inquiry, the court found that it was "clear" that Alvarado's intent was not to "document some aspect of a statement by Mr. Letkiewicz to be used in court thereafter." Rather, Alvarado's actions and quick response showed that Alvarado only intended to "resolv[e] the emergency that he [was] presented with upon his arrival."

¶ 32     The court also found that Letkiewicz's statements were not dying declarations because there was no evidence that Letkiewicz knew his death was imminent at the time he made his statements. Additionally, the court ruled that Letkiewicz's statements to Sibal were inadmissible because they were not spontaneous declarations, as they were made at least four hours after the startling occurrence, and they fell under neither the dying declaration or medical

treatment exception.

## B. Motion to Admit Other Crimes Evidence

The State also filed a pretrial motion for the trial court to allow proof of other crimes. At a hearing on the motion, the State stated that in March 2010, prior to the incident in October 2010, Letkiewicz's neighbor Maria Del Angel, who was married to Francisco, observed bruises on Letkiewicz's forearm and asked about them. Letkiewicz told Maria that Feliciano inflicted them, that Feliciano "had been beating him and taking his money," and that Letkiewicz wanted Feliciano to leave his house but Feliciano refused. Maria told her husband, Francisco, who went to Letkiewicz's house and confronted Feliciano about the incident. Feliciano did not deny the incident but rather "start[ed] yelling at [Letkiewicz] and acting in an abusive manner *** like he's going to strike the victim." Feliciano said, "[T]his is my house," and called the police. The State told the court that the bruises on Letkiewicz's arm in March 2010 were "strikingly similar" to the forearm injuries Letkiewicz had when he was found under the dresser in October 2010.

The defense responded that people Letkiewicz's age "bruise easily" and "don't heal," "[s]o it's hard to say where those bruises came from." Additionally, the defense pointed out that when the police came to Letkiewicz's house after Feliciano called the police, "no charges were filed" and "[n]o case came of it." Rather, the police escorted Feliciano out of the house "as they do when there is some sort of a minor domestic dispute of some kind."

The trial court found admissible the incident in which Letkiewicz's neighbors saw the bruises on Letkiewicz's arms. Additionally, the trial court found that Francisco's conversation with Feliciano in Letkiewicz's house and Feliciano's failure to deny Francisco's accusations were admissible. The court reasoned that Feliciano's failure to unequivocally deny the accusations was an adoptive admission.[1] The court stated that the admissible evidence showed "the relationship between the parties which *** apparently wasn't very good at times" and that the evidence showed Letkiewicz had previously sustained an injury similar to the one he received in October 2010. Accordingly, the trial court allowed the State to enter evidence that, after Maria talked with Letkiewicz, Francisco went to Letkiewicz's house and accused Feliciano of beating Letkiewicz and taking Letkiewicz's money and that Feliciano did not deny the accusation.

## C. Trial

At trial, Maria testified that, in 2010, she lived on the 2800 block of North Long Avenue, Chicago, Illinois, with her husband, Francisco Del Angel, and her three children. As of 2010, Maria had known her neighbor, Letkiewicz, for about 10 years. Letkiewicz was 94 years old and had lived alone after the death of his wife and sister-in-law. Maria described him as "strong, independent, [and] outgoing" and stated that he was still able to drive and would often

---

[1]On appeal, Feliciano does not dispute whether the trial court correctly found that his silence in response to Francisco's accusation in March 2010 was an adoptive admission. See *People v. Childrous*, 196 Ill. App. 3d 38, 53 (1990) ("When a statement is made in the presence and hearing of an accused, incriminating in character, and such a statement is not denied, contradicted or objected to by him, both the statement and the fact of his failure to deny it are admissible in a criminal trial as evidence of his acquiescence in its truth.").

come to her house to eat barbeque. Around late 2009 or 2010, Feliciano began to live with Letkiewicz.

¶ 39    One afternoon in March 2010, Maria saw Letkiewicz in his backyard and noticed that he looked scared and "was not his usual self." She called Letkiewicz, and when he approached, Maria saw "bruises up and down his arms and on his hands." Maria asked Letkiewicz what happened, spoke with him, and went back to her house. Later that day, she told her husband Francisco about Letkiewicz's bruises and what Letkiewicz told her. Letkiewicz visited and spoke with Maria and Francisco, and then Letkiewicz and Francisco went to Letkiewicz's house.

¶ 40    On October 13, 2010, Maria learned that Letkiewicz had been taken to the hospital in an ambulance. She visited him in the hospital and saw that he was "badly beaten," his face, eyes, and ears were swollen, and he had bruises on both his arms. The bruises on Letkiewicz's arms reminded Maria of the bruises she saw on him in March 2010, but they were "darker" and "more intense."

¶ 41    On cross-examination, Maria confirmed that Letkiewicz had gone to the hospital in January 2010 after he slipped on ice and fell. Letkiewicz had also stopped driving and sold his car after being in a car accident. On redirect examination, Maria confirmed that, after Letkiewicz's fall in January 2010, Letkiewicz was able to leave the hospital and resume his "independent living." However, after the October 2010 injury, Letkiewicz never left the hospital and died. The testimony of other State witnesses showed that Letkiewicz died on November 23, 2010, which was 41 days after Letkiewicz was taken from his house to the hospital.

¶ 42    Francisco Del Angel testified that Letkiewicz was a "strong old man" in "good condition" and that he never worried about Letkiewicz. At one point, Letkiewicz received a notice from the city that he needed to clean his house, and Feliciano began living with Letkiewicz when Letkiewicz needed more help with the cleaning. For about eight months, Feliciano lived in Letkiewicz's basement, and there was a door between the basement and the floor on which Letkiewicz lived.

¶ 43    On March 11, 2010, Letkiewicz spoke with Francisco and Maria at their house. Francisco saw "black and blue bruises" on Letkiewicz's arms and hands "like [Letkiewicz] was *** being hit." Francisco went to Letkiewicz's house with Letkiewicz "to "get [Feliciano] out [of] the house." Francisco and Letkiewicz conversed in Letkiewicz's living room. Then, Feliciano "stormed" in through the basement door looking angry, "crazy," and "steaming." Feliciano said "he wasn't going to leave his house and his money" about three or four times and called the police. Police officers arrived, and Letkiewicz told the officers he wanted Feliciano out of his house. The police took Feliciano out of the house, and Francisco did not see Feliciano living at Letkiewicz's house from March 2010 to October 13, 2010. On October 11, 2010, Francisco saw Letkiewicz, who appeared healthy and in "good condition" and was working on a doorbell.

¶ 44    Then, on October 13, 2010, at about 8:45 p.m., Francisco received a phone call and learned that a window at Letkiewicz's house was open. He walked to Letkiewicz's house, saw that the front basement window was broken, and noticed the lights in Letkiewicz's bedroom were on. Using spare keys he had received from Letkiewicz, Francisco entered Letkiewicz's house and heard somebody "mumbling" and "crying for help." Francisco saw Letkiewicz lying on the floor of his bedroom with a "tall," six-drawer dresser on top of him, "mumbling and moving his hands." Letkiewicz's face was "full of blood," his eyes were swollen shut, his cheeks were

swollen, there were bruises on his arms and hands, and he had no clothes on. The bedroom looked "ransacked," and Francisco testified that the room had not looked that way before.

¶ 45　　Francisco approached Letkiewicz and identified himself. Letkiewicz looked angry and screamed about five or six times that Feliciano had taken his wallet and money. Francisco asked Letkiewicz "who did this," and Letkiewicz stated about four or five times that "Gilbert did this." Francisco ran outside and told his son to call the police, which his son did. When the police and paramedics arrived, Francisco pushed the dresser off Letkiewicz. Francisco heard Letkiewicz tell the police and paramedics about three or four times, "Gilbert did it."

¶ 46　　Feliciano testified regarding photographic evidence of Letkiewicz before October 13, 2010, Letkiewicz's dining room, the door to Letkiewicz's basement with damage that was observed on October 13, 2010, the broken window at the front of Letkiewicz's house, the dresser that was on top of Letkiewicz, and Letkiewicz's bedroom. The parties also stipulated that, if one particular photograph was shown, Francisco would identify the photograph as depicting Letkiewicz in death.

¶ 47　　On cross-examination, Francisco specified that, prior to October 2010, Letkiewicz had received a notice from the city to clean his house and basement because there was too much clutter, paint peeling off, and mold in the basement. Francisco also confirmed that leading up to October 2010 he could smell rotting food in the house. Further, he confirmed that during the confrontation in March 2010 police did not arrest Feliciano when Feliciano called the police to Letkiewicz's house. According to Francisco, the window to Letkiewicz's basement, where Feliciano had lived, was about two feet wide and three feet high. While Francisco acknowledged that the hole broken into the window was only about 12 inches by 6 inches, he clarified that the window was also open, showing that "they broke the window on top" in order to unlock the window.

¶ 48　　On redirect examination, Francisco confirmed that Letkiewicz's bedroom was "normally in pretty decent shape" and was typically not as cluttered as it was on October 13, 2010. While Francisco did not have training in recognizing dementia, he denied that Letkiewicz ever seemed confused or did not know what he was doing, and he stated that Letkiewicz always recognized him and called him by his name. On recross-examination, Francisco said that the window to Letkiewicz's basement, where Feliciano had lived, was left about a little more than halfway opened.

¶ 49　　Chicago Fire Department paramedic Hernandez testified that on October 13, 2010, at about 9 p.m., she and her partner Holiday were called to Letkiewicz's house to assist a battery victim. They found Letkiewicz "[lying] on the bedroom floor on a *** pile of clothes," and took him to the ambulance on a stretcher. Hernandez saw "bruising on [Letkiewicz's] arms and his face" and "dried blood in his nose and mouth." Letkiewicz told them multiple times that "he was beat up by Gilbert."

¶ 50　　On cross-examination, Hernandez confirmed that she did not ask Letkiewicz for any further information such as Gilbert's last name, when the beating occurred, or specifically what Gilbert did to Letkiewicz. She also confirmed that there was no test conducted to determine whether Letkiewicz had dementia or Alzheimer's disease.

¶ 51　　Holiday largely corroborated Hernandez's testimony but added that Hernandez had 100% oxygen saturation in his blood and brain, so he was not concerned about Letkiewicz suffering from confusion. Holiday also testified that he conducted the Glasgow Coma Scale test to assess whether Letkiewicz was "alert to person[,] place[,] and time," and Letkiewicz was alert and

able to respond to Holiday's questions and commands correctly. Letkiewicz received an 11 out of 15 on the test because Holiday could not understand some of the things Letkiewicz was saying, but Holiday was not worried about Letkiewicz's "mental capacity."

¶ 52 On cross-examination, Holiday confirmed that the Glasgow Coma Scale test measures someone's "level of consciousness" but does not test for dementia or Alzheimer's disease. Holiday also confirmed that the sheet showing the test's results reflected a score of "two" for the verbal portion. However, Holiday stated that, while Letkiewicz was "[i]ncomprehensible" at times, it just meant Holiday "didn't understand him" and not that Letkiewicz was confused. Holiday stated that he could not understand Letkiewicz "[b]ecause of the blood in [Letkiewicz's] mouth."

¶ 53 Chicago police officer Alvarado testified that at about 8:45 p.m. that night, he and his partner Ramirez were called to assist the Chicago Fire Department's emergency medical services personnel at Letkiewicz's house. They arrived at the scene and spoke with Francisco, and Alvarado went to speak with Letkiewicz inside the ambulance. Alvarado testified that he approached Letkiewicz "[t]o find out what occurred to him and who did this to him." He saw Letkiewicz on a stretcher looking "frail, weak, [and] hurt" but could not observe any injuries because a blanket covered Letkiewicz's body and an oxygen mask covered his face. Nonetheless, Alvarado saw blood and bruising on Letkiewicz's face. Alvarado initially testified that he approached Letkiewicz and asked "what had happened." Later in his testimony, however, Alvarado testified that he asked, "[W]ho did this to you?" Letkiewicz looked at Alvarado with an "angry" demeanor and quickly responded, "Gilbert did."

¶ 54 Dr. Kim testified that at about 9 p.m. she acted as Letkiewicz's primary doctor for Letkiewicz in the emergency room of the hospital where Letkiewicz was taken. Letkiewicz had "multiple trauma to his face and extremities," specifically "bruising" and "swelling *** on his face, as well as [a] significant amount of bruising on his ear and *** upper extremities." Letkiewicz also had facial fractures in his eye sockets and a "hemorrhagic contusion of his brain," which Dr. Kim explained meant "[b]ruising of the brain that ended up in little parts of bleeding that you see on the brain tissue." She conducted a neurological examination and found that Letkiewicz "was alerted to himself, the place, as well as what was going on," and the time, and he was responsive and able to follow directions. Additionally, Dr. Kim concluded that Letkiewicz had suffered his injuries a "[c]ouple of days" before his hospitalization, based on the "dried blood in his mouth" and "cool skin" on his extremities, which "means he was exposed and not under a blanket or moving around for a long period of time." Letkiewicz also exhibited "rhabdomyolysis which is the breaking down of his muscle tissue which happens when patients are down for a long period of time." Overall, Letkiewicz was in the emergency room for three or four hours, during which Dr. Kim had multiple conversations with Letkiewicz and did not doubt Letkiewicz's competence. When she asked Letkiewicz what happened, he appeared "upset" and "angry" and said, "Gilbert did it." Dr. Kim confirmed that photographs entered into evidence by the State showed the injuries on Letkiewicz's face, arms, and right hand.

¶ 55 On cross-examination, Dr. Kim confirmed that people with dementia can sometimes be oriented to themselves and their location. She also confirmed that Letkiewicz had "newer bruises" but that he also had "older bruises" and that Letkiewicz had thinner skin as a 94-year-old man.

¶ 56     Dr. Ariel Goldschmidt testified that on November 25, 2010, he worked as an assistant medical examiner for Cook County and conducted Letkiewicz's autopsy. Dr. Goldschmidt concluded that Letkiewicz's cause of death was "cerebral injuries due to blunt cranial trauma due to assault" and the "manner of death" was homicide.

¶ 57     Dr. Goldschmidt also observed that Letkiewicz had a pacemaker and "incisions for tubes to his head." As to injuries, Dr. Goldschmidt observed that Letkiewicz had a bruise and scrape on his left temple, scrapes on his right forearm and left ankle, and abrasions on his right lateral forearm. There was subdural bleeding on the inside of Letkiewicz's skull, and Dr. Goldschmidt testified that "subdural" meant "the dural covering of the brain." Dr. Goldschmidt confirmed there was a "healing bleed" around Letkiewicz's brain, which appeared to be "at least over ten days old," and a healing bruise on the left side of Letkiewicz's brain.

¶ 58     On cross-examination, Goldschmidt confirmed that he had seen cases where people suffered brain bleeding from falling and car accidents. He confirmed that the neurosurgeon who had operated on Letkiewicz had stated Letkiewicz's death was "non cranial," meaning the surgeon "didn't feel that the *** bleeding led to death." Then, the following colloquy occurred:

"Q. All right. Well, will you go through the chain. Tell us exactly what was the chain of events that led from this head trauma, as you see it, to his death [approximately] 40 days later. What was [the] uninterrupted chain. What happened?

A. This gentleman [who was] 94 year old was apparently living independently and then during this assault suffered fractures, facial fractures, and bruises to the brain and hemorrhages around the brain either worse than what he already had or new hemorrhages around the brain. At that time he went to the hospital in order to start the healing process. And apparently there [were] some complications where he was having trouble swallowing so he had a[n] *** extended stay at the hospital. While [at] the hospital he had some medical procedures done. And also suffered a fall and ultimately expired.

Q. What in that chain of events caused you to say that the head injury cause[d] his death? What exactly was it[?] He was healing?
Right?

A. Yes.

Q. His subdural was healing?

A. Yes.

Q. So what is it that happened that you just said caused his death?

A. Well, I mean to make it simple he was living independently before the head injury of the assault and afterward he was never able to leave medical care.

Q. So that is your reason?

A. Yes."

¶ 59     Goldschmidt also confirmed that Letkiewicz had hypoxemia, meaning a "decreased oxygen supply to the brain"; acidosis, meaning a "chemical imbalance in the blood"; and hypovolemia, meaning "a decrease in circulating blood and fluids." Nonetheless, Dr. Goldschmidt testified that these conditions could be attributed to Letkiewicz's head injury because they were components of his health that "began deteriorating when [Letkiewicz] suffered the head injury." Dr. Goldschmidt also confirmed that Letkiewicz suffered a cardiac

arrest[2] and had "acute gastro intestinal hemorrhage,"[3] the cause of which was never determined.

¶ 60    The State rested.

¶ 61    The defense called Dr. Matthew Galloucis, who testified that around January 17, 2010, he worked as a rehabilitation psychologist and evaluated Letkiewicz's "general functioning." Dr. Galloucis testified that Letkiewicz had fallen and was admitted to the hospital on January 11, 2010, due to an "ankle fracture," "a mass in his groin," and "penile discomfort." Dr. Galloucis learned that in January, Letkiewicz had also fallen onto his buttocks while in the hospital.

¶ 62    Dr. Galloucis asked Letkiewicz questions about his mood and how he was feeling. He observed that Letkiewicz was "obviously upset" and "experiencing some pain," which Dr. Galloucis described as "the initial *** adjustment reactions" to having been hurt and hospitalized and having undergone recent surgery. Letkiewicz told Dr. Galloucis that he "felt mixed up at times" after his surgery, and Letkiewicz was confused about the purpose of a bar above his bed that was intended to assist his movement. While Letkiewicz was "oriented to person, time and place," he appeared confused as to recent events prior to his hospitalization. He also appeared confused as to specific dates, had difficulty with "sustained concentration" and "short-term memory," and had slow mental processing, meaning it took Letkiewicz a "longer time" to make "simple calculations" or accomplish "general problem-solving." However, Dr. Galloucis testified that Letkiewicz's age, recent surgery, and pain medications could have contributed to his slower mental processing. Dr. Galloucis additionally noted potential impairment in "[e]xecutive functioning," which is "the higher order cognitive functions that *** involve*** more complex cognitive processes such as *** complex attention, abstract reasoning, organization, planning, foresight, the ability to ***monitor one's self in terms of doing activities, planning and cognitive flexibility," meaning the ability to easily shift focus.

¶ 63    Dr. Galloucis left a "tentative," "provisional diagnosis" regarding Letkiewicz "to rule out dementia." Further, he confirmed that a person with dementia can still be oriented to time and place.

¶ 64    On cross-examination, Dr. Galloucis confirmed that he could not conclude Letkiewicz had dementia. He also confirmed that, after Letkiewicz's surgery, Letkiewicz was placed on pain medications, including Vicodin and Haldol, which was a sedative that "can change the chemicals of your brain." When Dr. Galloucis examined Letkiewicz, he "felt that [Letkiewicz] had postsurgical confusion that was clearing up." Nonetheless, Dr. Galloucis could not confirm whether Letkiewicz's confusion was chronic because he did not know Letkiewicz beforehand. Dr. Galloucis also confirmed that Letkiewicz was "able to express his current concerns and immediate needs regarding his medical attention," "did not exhibit any bizarre or odd behaviors or mannerisms," exhibited "spontaneous, fluent and generally coherent" speech, showed no signs of "significant psychomotor agitation or observed abnormal involuntary movement," "had a fair ability to track and follow *** conversation," showed no signs of "significant thought disorder," had a "generally coherent and goal-directed thought process,"

---

[2]It is unclear from the record when Letkiewicz's cardiac arrest occurred.

[3]The record reflects that Letkiewicz's gastrointestinal hemorrhage was observed during his final hospitalization, between the time of the offense and his death.

had no "observed fluctuation" in alertness, and was "oriented to person, place, time and situation."

¶ 65    The defense also called Dr. Mark Shuman, who testified that he reviewed the records regarding Letkiewicz's autopsy. Dr. Shuman could not confirm the cause of Letkiewicz's death but stated it could have been Letkiewicz's "underlying hypertensive heart disease" or "gastrointestinal hemorrhage."

¶ 66    Dr. Shuman summarized that, prior to his death, Letkiewicz had been hospitalized several times: (1) once in January 2010 when he fractured his ankle and had a hernia; (2) once in July 2010 following a car accident, when Letkiewicz went to the hospital for chest pain, which turned out to be a heart condition, and had a pacemaker inserted; (3) once in October 2010 following his assault, after which he was transferred to a nursing facility for further rehabilitation; and (4) the final "acute" hospitalization in November 2010 to treat Letkiewicz's gastrointestinal hemorrhage. According to Dr. Shuman, Letkiewicz remained in an "acute-care setting" at the hospital for six days in October 2010 not because of his head injury but because of "underlying conditions" that were noted "as early as January" regarding his cognitive issues.

¶ 67    Dr. Shuman further explained that, after Letkiewicz's October 2010 hospitalization, Letkiewicz "had a significant gastrointestinal hemorrhage," meaning Letkiewicz was "bleeding from his intestines," which "probably" caused Letkiewicz to become dizzy and fall due to the blood loss. Letkiewicz was returned to "acute hospitalization" for treatment of the gastrointestinal hemorrhage. While at the hospital, a computed tomography (CT) scan of Letkiewicz's brain was conducted, and it was noted Letkiewicz had accumulating fluid around his brain. The fluid was drained, and Letkiewicz "died suddenly the next day." Dr. Shuman also acknowledged that Letkiewicz had fallen and hit his head at the hospital in November, but he stated that the fluid drained from Letkiewicz's head was described as "older" and had likely been there for a longer period of time. Dr. Shuman opined that, because Letkiewicz's head was drained, there was no longer any "pushing" or pressure and it therefore "wasn't causing any mass effect." Dr. Shuman also confirmed that a person can live with "some fluid on their brain" and testified that such a condition can either heal itself, stay the same, or "get bigger."

¶ 68    Dr. Shuman stated his opinion that "the chain was interrupted" and that Letkiewicz had "got[ten] better from the assault as far as his brain" was concerned but "died of something else." Dr. Shuman could not conclude whether Letkiewicz's intestines had started bleeding again just before Letkiewicz's death because there was no description of the intestines in the autopsy report. Additionally, Dr. Shuman stated there was little information about Letkiewicz's circumstances "other than he was found in something called *** pulseless electrical activity," which generally occurs when acid levels in the blood are too high. According to Dr. Shuman, this condition can be caused by heart disease.

¶ 69    Additionally, Dr. Shuman stated that he learned from medical records dated back to January 2010 that Letkiewicz had dementia. Dr. Shuman also observed that in November 2010, after Letkiewicz's death, the neurosurgeon who operated on Letkiewicz noted that Letkiewicz's postdrainage CT scan showed the fluid around Letkiewicz's brain had drained, his brain had expanded, and Letkiewicz's cause of death was "non-cranial."

¶ 70    On cross-examination, Dr. Shuman confirmed that, following Letkiewicz's hospitalizations in January and July 2010, Letkiewicz returned home and resumed living independently. There were no records of a brain injury during Letkiewicz's July hospitalization after the car accident. Rather, Letkiewicz had a pacemaker installed and returned home two

days later. However, fluid was found in Letkiewicz's brain during his October 2010 hospitalization. After the October hospitalization, Letkiewicz was never sent home. Dr. Shuman confirmed that the January 2010 note he referred to regarding Letkiewicz's dementia was made by Dr. Galloucis. He also confirmed that Dr. Galloucis's note was only a "provisional" diagnosis to "rule out dementia."

¶ 71    On redirect examination, Dr. Shuman testified that the fact that Letkiewicz never returned home between October 13, 2010, and his death on November 23, 2010, had nothing to do with his cause of death. Rather, the causal "chain" was "broken" when Letkiewicz "got better and was recovering from his head injury and had to stay in an extended care because of his underlying medical disorders and his age." On recross-examination, Dr. Shuman testified that Letkiewicz was "in between" the primary and final stages of dementia but that Letkiewicz "was in enough stages of dementia that they felt like he shouldn't be living by himself."

¶ 72    In closing arguments, the State asserted that Letkiewicz had invited Feliciano to his home, who later caused Letkiewicz's death when he beat him in October 2010. The State argued that the jury could infer that Feliciano committed the crime based on the broken window leading into the basement where Feliciano had lived. The jury could also infer that Feliciano robbed Letkiewicz based on Letkiewicz's injuries and the "ransacked" state of Letkiewicz's bedroom.

¶ 73    The defense argued in closing that in January 2010 Dr. Galloucis had noted that Letkiewicz was "mixed up" and "confused" and that Dr. Galloucis "wanted to rule out dementia." The defense also asserted that Letkiewicz had a "history of falls" and that the car accident and falls Letkiewicz suffered prior to October 2010 also could have started the bleeding in his brain. As to the March 2010 confrontation between Feliciano, Francisco, and Letkiewicz, the defense argued that Feliciano was likely "upset" because Francisco and Letkiewicz were talking about "forcing [Feliciano] out into the street." Feliciano called the police because "they were trying to throw him out of his home." Then, the defense clarified to the jury that they were focused on dementia because "the State's entire case is resting on" Letkiewicz's statements. The defense suggested that Letkiewicz's mental health affected his credibility and also suggested that Letkiewicz may have accused Feliciano because Letkiewicz was angry at Feliciano from the March 2010 encounter.

¶ 74    As to the first degree murder charges, the defense stated that it was not clear how Letkiewicz got his injuries and that they may not have even been the result of someone "punch[ing]" him. The defense claimed that Letkiewicz's head and face injuries may have been the result of the dresser falling on him. The defense further questioned:

> "If somebody did punch him, do you really think that [by] punching you intend to kill somebody? How about if you just intend to get them away from you or you intend to get them to stop doing something? How can that be intentional? How can you know that if you give somebody one punch that that one punch is going to kill him? You have no idea."

¶ 75    As to home invasion, the defense argued that there was no physical evidence to corroborate Letkiewicz's statements from October 13, 2010, such as blood or fingerprints surrounding the broken window. As to robbery, the defense asserted that there was no evidence that "anything was missing." While Letkiewicz stated that Feliciano stole his money, the defense claimed the evidence did not show Letkiewicz was specifically referring to the incident in October 2010.

¶ 76    In rebuttal, the State stated, "When Maria and Francisco tell you about the relationship that [Feliciano] had with [Letkiewicz], it all makes sense." The State recounted that, when

- 14 -

Francisco confronted Feliciano, Feliciano went "berserk" and expressed the view that Feliciano was "entitled to what [Letkiewicz] has." The State argued this was important "[b]ecause not only do you get a little view of what [Letkiewicz's] life was like when he lived with [Feliciano], you get a little view of the temper that [Feliciano] had."

¶ 77    The jury found Feliciano guilty of first degree murder, robbery of a person 60 years of age or older, and home invasion.

¶ 78                              D. Posttrial Proceedings

¶ 79    Feliciano filed a motion for new trial, alleging that the State failed to prove him guilty beyond a reasonable doubt, that Feliciano was "denied due process of law," that Feliciano did not receive a fair and impartial trial, and that the State made "prejudicial, inflammatory, and erroneous statements" in opening statement and closing argument.

¶ 80    Feliciano also filed a supplemental motion for new trial providing further detail of the claims in the original motion. Feliciano claimed he was denied due process when the trial court allowed Letkiewicz's hearsay statements to be admitted at trial and that the State improperly admitted hearsay statements concerning the "proof of other crimes incident of March, 2010."

¶ 81    The trial court sentenced Feliciano to consecutive prison sentences of 40 years for one count of first degree murder, 10 years for one count of home invasion, and 4 years for one count of robbery, for a total sentence of 54 years' imprisonment. This appeal followed.

¶ 82                                   ANALYSIS

¶ 83    On appeal, Feliciano challenges both the sufficiency of the evidence at trial and the admissibility of a large portion of that evidence. We will first consider Feliciano's admissibility-based challenges before considering whether the admissible evidence at trial was sufficient to prove Feliciano guilty beyond a reasonable doubt.

¶ 84           A. Admissibility of Letkiewicz's Statements on October 13, 2010

¶ 85    On appeal, Feliciano asserts that the trial court erred in allowing the State to introduce multiple of Letkiewicz's statements made to individuals on October 13, 2010. According to Feliciano, the statements were inadmissible because the startling occurrence of being found had passed by the time Letkiewicz made the statements. Feliciano additionally claims that Letkiewicz's statements to Officer Alvarado and the medical personnel in particular were inadmissible because they were testimonial statements, as they were made in response to an interrogation intended to collect information for a future prosecution.

¶ 86    The State responds that the trial court properly found that Letkiewicz's statements were spontaneous declarations because the specific length of time between the occurrence and the statement does not affect the admissibility of a statement under the spontaneous declaration exception. The State emphasizes the severity of Letkiewicz's injuries and observes that the testimony before the trial court showed that Letkiewicz was excitable when he made the statements in question. The State also argues that Letkiewicz's statements made in response to police and medical personnel were not testimonial because they were made for purposes of gathering information to meet an ongoing emergency.

¶ 87    The confrontation clause of the sixth amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with

- 15 -

the witnesses against him." U.S. Const., amend. VI. In *Crawford v. Washington*, 541 U.S. 36 (2004), the United States Supreme Court reinterpreted the confrontation clause, holding that "the testimonial hearsay statements of a witness who is unavailable at trial may not be admitted against a criminal defendant unless the defendant had a prior opportunity for cross-examination." *People v. Patterson*, 217 Ill. 2d 407, 423 (2005) (citing *Crawford*, 541 U.S. at 68). "The hearsay rule generally prohibits the introduction of an out-of-court statement offered to prove the truth of the matter asserted therein." *People v. Williams*, 238 Ill. 2d 125, 143 (2010).

¶ 88                              1. Whether Letkiewicz's Statements Were Testimonial

¶ 89        We first examine whether Letkiewicz's statements to the police officers and medical personnel were testimonial, which is "often the threshold issue under confrontation clause analysis." *People v. Cleary*, 2013 IL App (3d) 110610, ¶ 37.

¶ 90        In its interpretation of the confrontation clause, the *Crawford* Court turned to Webster's dictionary, noting it defined the word "testimony" as "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." (Internal quotation marks omitted.) *Crawford*, 541 U.S. at 51. The Illinois Supreme Court has delineated from *Crawford*'s analysis two prongs for determining whether a statement is testimonial: (1) the statement "must be made in solemn fashion," and (2) "the statement must be intended to establish a particular fact," so that in making the statement, the speaker "was acting in a manner analogous to a witness at trial, describing or giving information regarding events which had previously occurred." *People v. Stechly*, 225 Ill. 2d 246, 281-82 (2007).

¶ 91        The United States Supreme Court has further held that "interrogations by law enforcement fall squarely within [the] class of testimonial hearsay" where the interrogations are "solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator." (Internal quotation marks omitted.) *Davis v. Washington*, 547 U.S. 813, 826 (2006). More specifically, such statements are testimonial "when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 822. However, "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Id.* Relevant factors that establish a statement to an interrogation is nontestimonial include where "(1) the victim was speaking about events as they were actually happening rather than describing past events; (2) the victim was facing an ongoing emergency; (3) the statements were necessary to resolve the present emergency rather than simply to learn what had happened in the past; and (4) the statements were made frantically, in an environment that was not tranquil or safe." *People v. Sutton*, 233 Ill. 2d 89, 113 (2009) (citing *Davis*, 547 U.S. at 827). We review *de novo* the issue of whether a statement is testimonial. *Id.* at 112.

¶ 92        The evidence at the suppression hearing showed that Letkiewicz was found under a dresser in his bedroom with dried blood in his mouth; injuries on his face, arms, and hands; and urine and feces on him. When paramedics Hernandez and Holiday arrived at Letkiewicz's house, Letkiewicz was upset and repeatedly told them that "Gilbert" beat him up. Hernandez testified that she did not overhear anyone ask who had caused Letkiewicz's injuries, and she did not remember asking Letkiewicz who caused his injuries either. Once Letkiewicz was placed in

the ambulance, Officer Alvarado entered the ambulance and asked Letkiewicz, "Who did this to you?" We note that, later at trial, Alvarado presented conflicting evidence that he both asked Letkiewicz "what had happened" and "who did this to you?" To the latter question, Letkiewicz responded, "Gilbert did." Neither the paramedics nor Alvarado asked any follow-up questions regarding "Gilbert." Letkiewicz was quickly taken to the emergency room, where Dr. Kim asked Letkiewicz what happened to him, and Letkiewicz stated that "Gilbert" did it. The trial court found that these statements were not testimonial. As to Letkiewicz's response to Alvarado in particular, the trial court found that Alvarado's question was clearly an attempt to assess what happened to assist in an emergency and not to identify a perpetrator for a future case.

¶ 93        The circumstances here clearly satisfied three of the four factors identified by *Davis* and our supreme court for finding that a response to an interrogation is nontestimonial. Specifically, (1) Letkiewicz was facing an ongoing emergency, given his critical condition and potential lack of food or water for one or two days; (2) Letkiewicz's statements were necessary to resolve the present emergency, namely, to explain what happened to him to assist in his medical treatment and clarify whether the perpetrator was still present at the scene; and (3) Letkiewicz's statements were made frantically, as the testimony showed that he was upset and angry as he spoke, and he was in a severely injured condition. See *id.* at 113 (citing *Davis*, 547 U.S. at 827). As to the fourth factor of whether Letkiewicz was describing events as they were happening as opposed to describing past events, we also find that Letkiewicz was not strictly referring to past events, as his statement that he was beaten by someone was necessary to describe his present condition, which further provided context necessary to receive assistance. See *People v. Dobbey*, 2011 IL App (1st) 091518, ¶ 53 (discussing the Supreme Court's finding that a 911 call is "not designed to establish or prove past facts, but to describe a circumstance requiring police assistance" (citing *Davis*, 547 U.S. at 827)).

¶ 94        The circumstances in which Letkiewicz made his statements were also informal and not made in a solemn fashion. Letkiewicz was pulled onto a stretcher and into an ambulance as he repeatedly stated that "Gilbert" beat him. Any questions Letkiewicz received were broadly phrased as "what happened" or "who did this," and Letkiewicz only stated that Gilbert did it. There is no testimony or evidence in the record showing that any of the witnesses asked to clarify who Gilbert was, what Gilbert's last name was, or where Gilbert went. See *id.* ¶¶ 63, 65 (finding the victim's statements that the defendant shot him were not made in a solemn fashion and were not intended to establish or prove past events, where the defendant was in serious pain from being shot in the abdomen and stated that the defendant shot him after he was pulled from a vehicle).

¶ 95        In fact, we note that only Alvarado testified that he asked Letkiewicz who beat him, although he also testified inconsistently that he asked Letkiewicz "what had happened" to him. Dr. Kim simply asked what happened, and Hernandez's testimony suggested that Letkiewicz was not asked any questions regarding the offense when he stated that "Gilbert" beat him. There is a significant difference between asking what happened and asking who beat Letkiewicz. Simply asking what happened certainly cannot be construed here as an attempt to identify a perpetrator for future prosecution of a case.

¶ 96        We disagree with Feliciano's assertion that Letkiewicz's statement to Dr. Kim was testimonial because the emergency had passed by the time Letkiewicz entered the emergency room. Given Letkiewicz's severe condition, the emergency was clearly ongoing when

Letkiewicz entered the emergency room, and Dr. Kim required information to understand what had happened to Letkiewicz in order to treat him. Moreover, Dr. Kim testified that she treated Letkiewicz at 9 p.m., less than half an hour after Francisco testified that he found Letkiewicz under the dresser. Based on this time frame, the jury was permitted to find that Dr. Kim had asked Letkiewicz what happened to him soon after the startling occurrence ended.

¶ 97    Ultimately, Letkiewicz's statements to Hernandez, Holiday, Alvarado, and Dr. Kim were made in the context of assisting Letkiewicz as he was being treated for his injuries. Given this context, we cannot find that Letkiewicz's statements to Alvarado and the medical personnel were intended to provide information for a future prosecution. Rather, the witnesses clearly intended to assist Letkiewicz, who had been severely beaten and possibly left without food or water for one or two days, and the assistance in part entailed learning what had happened to Letkiewicz.

¶ 98    We recognize that some courts have found government involvement is required to implicate the application of the confrontation clause, which raises questions as to whether the statements made to medical personnel can even implicate the confrontation clause. See *People v. Richter*, 2012 IL App (4th) 101025, ¶ 156. Nonetheless, we need not decide whether the confrontation clause applies to Letkiewicz's statements to the medical personnel in this case. Based on the circumstances, we find that Letkiewicz's statements were not made to provide information for a future prosecution and therefore were not testimonial and do not implicate the confrontation clause. See *Sutton*, 233 Ill. 2d at 115-16 (finding statements made by the victim in response to police questioning were nontestimonial, where "[t]he officers arrived on the scene in response to a report of a man banging on doors and ringing doorbells"; the offender was no longer present when the officers arrived; the officers saw the victim "bloody and staggering"; the victim said that he had been robbed and shot and that his girlfriend had been shot; and the officers immediately asked "who had done this," where the victim's girlfriend was, and "where the person went").

¶ 99                    2. Whether the Spontaneous Declaration Exception
                          Applies to Letkiewicz's Statements

¶ 100    Having found that Letkiewicz's statements were nontestimonial, we now consider whether the spontaneous declaration exception to the hearsay rule applies, as nontestimonial statements "are still subject to 'traditional limitations upon hearsay evidence.' " *Stechly*, 225 Ill. 2d at 279 (quoting *Davis*, 547 U.S. at 821).

¶ 101    For a hearsay statement to be admissible under the spontaneous declaration exception, "(1) there must have been an occurrence that was sufficiently startling to produce a spontaneous and unreflecting statement, (2) there must have been an absence of time between the occurrence and the statement for the declarant to fabricate the statement, and (3) the statement must relate to the circumstances of the occurrence." *People v. Robinson*, 217 Ill. 2d 43, 62 (2005). "A spontaneous declaration *** is admitted to prove the truth of the matter asserted." *People v. Henricks*, 32 Ill. App. 3d 49, 52 (1975). When determining whether a hearsay statement is admissible under the spontaneous declaration exception, courts consider the totality of the circumstances, including factors such as "time, the nature of the event, the mental and physical condition of the declarant, and the presence or absence of self-interest." (Internal quotation marks omitted.) *People v. Williams*, 193 Ill. 2d 306, 352 (2000). When determining whether the spontaneous declaration exception applies, our supreme court has

- 18 -

described the "time factor" as "elusive," as its significance varies with each case's facts. (Internal quotation marks omitted.) *Id.* at 353. "The proper question is whether the statement was made while the excitement of the event predominated." (Internal quotation marks omitted.) *People v. Smith*, 152 Ill. 2d 229, 260 (1992). "[T]he fact that a statement was made in response to a question does not necessarily destroy spontaneity ***." *Williams*, 193 Ill. 2d at 353. "Whether a statement is admissible as a spontaneous declaration is within the trial court's purview and its decision will not be overturned absent an abuse of discretion." *People v. Sullivan*, 366 Ill. App. 3d 770, 780 (2006).

¶ 102   Feliciano essentially argues that the State did not establish the second element for establishing the spontaneous declaration exception, namely, whether there was "an absence of time" between the startling occurrence Letkiewicz experienced and Letkiewicz's statements for Letkiewicz to fabricate his statements. Feliciano concedes that "whatever happened" that led to Letkiewicz being trapped under a dresser "were undeniably sufficiently startling events."

¶ 103   We initially note that Feliciano claims the record does not reveal how long Letkiewicz was trapped under the dresser. However, there was certainly evidence regarding when Letkiewicz suffered his injuries. At the hearing, Francisco testified that he last saw Letkiewicz in "good condition" on October 11, 2010, and that he found Letkiewicz under the dresser on October 13, 2010. Dr. Kim additionally testified that the newer bruises on Letkiewicz's face, arms, and hands were one or two days old. This testimony would have supported a factual determination by the trial court that Letkiewicz had been trapped under the dresser for as long as two days.

¶ 104   To determine whether the spontaneous declaration exception applies, we find *People v. Gacho*, 122 Ill. 2d 221 (1988), instructive. In *Gacho*, a forest ranger found two victims, one still alive and one dead, in the trunk of a parked automobile. *Id.* at 230-31. The victims had been shot and stuffed in the trunk of a vehicle for 6½ hours. *Id.* at 240. The officer asked the victim who was still alive to identify " '[w]ho did this to [him],' " and the victim stated a name similar to the defendant's name. *Id.*

¶ 105   The supreme court in *Gacho* agreed with the trial court that the victim's statement constituted a spontaneous declaration. *Id.* at 240-42. The court reasoned that (1) the experience of suffering "multiple gunshot wounds and subsequent confinement in the trunk" would have produced an "unreflected statement," (2) the victim's statement was the first opportunity to speak with anyone after a long period of confinement in a seriously wounded condition, and (3) the defendant could not have spent the 6½ hours fabricating a statement given the circumstances, in which he was wounded in a vehicle's trunk for so long "with a dead man on a cold December night." *Id.* at 241. The supreme court therefore affirmed the trial court's finding of admissibility. *Id.* at 242.

¶ 106   Just as in *Gacho*, the evidence at the pretrial hearing here showed that Letkiewicz sustained severe injuries and was trapped in an uncomfortable, confined position for an extended period of time. Specifically, Letkiewicz was 94 years old when he was trapped under a dresser for one or two full days, covered in urine and feces, with dried blood in his mouth, with a broken eye socket, and with multiples other injuries to his face, arms, and hands. The evidence also supported a reasonable inference that Letkiewicz had likely not eaten or had water for those one or two days and that he had not come into contact with anyone during that time period other than the person who beat him, whom Letkiewicz identified as Feliciano. Once Francisco found Letkiewicz under the dresser just before 9 p.m., Letkiewicz immediately told him that "Gilbert did it." Once the police and paramedics arrived, he likewise made the same statement

to them, and at around 9 p.m. in the emergency room, Letkiewicz made the statement to Dr. Kim as well. The State's witnesses all stated that Letkiewicz appeared angry or upset when he made these statements and that he repeatedly made the statement, "Gilbert did this to me" or "Gilbert did it."

¶ 107    Just as the supreme court in *Gacho* found, we also find that the trial court properly found that, during this extremely painful and traumatic period of time, Letkiewicz likely could not have fabricated a story regarding who put him in that situation. *Id.* at 241-42. Rather, the evidence supported a finding by the trial court that Letkiewicz's statements were made "while the excitement of the event predominated." (Internal quotation marks omitted.) *Smith*, 152 Ill. 2d at 260.

¶ 108    Feliciano asserts that the spontaneous exception does not apply to Letkiewicz's statements that were made in response to witnesses' questions, as the fact that they were elicited by questions negates the exception's requisite spontaneity. However, while "a statement made in response to persistent interrogation might not be admitted under the spontaneous declaration exception [citation], the fact that a statement was made in response to a question does not necessarily destroy spontaneity." *Williams*, 193 Ill. 2d at 353. Given the other circumstances, namely the amount of time Letkiewicz was left under the dresser, the severity of his injuries, the testimony regarding his demeanor while he spoke, and the consistency of his statement that "Gilbert" beat him, we find that the trial court did not abuse its discretion in finding that Letkiewicz's statements on October 13, 2010, were admissible under the spontaneous declaration exception to the hearsay rule.

¶ 109                              B. Other-Crimes Evidence

¶ 110    Feliciano next asserts that the trial court erred in allowing the State to enter other-crimes evidence of the confrontation between Feliciano, Francisco, and Letkiewicz in Letkiewicz's house in March 2010. According to Feliciano, the trial court allowed the evidence to be admitted for an improper purpose, namely to show the relationship between the parties. Feliciano also asserts that the admission of this evidence was overly prejudicial to him. The State responds that this evidence was properly admitted because it was probative of Feliciano's intent and motive, which was established through evidence regarding Feliciano's prior abuse of, and "antagonistic relationship" with, Letkiewicz.

¶ 111    The parties do not dispute whether any hearsay statements from March 2010 that were entered into evidence fell under an exception to the hearsay rule.

¶ 112    Generally, "evidence of other crimes is admissible if it is relevant for any purpose other than to show the defendant's propensity to commit crimes." *People v. Wilson*, 214 Ill. 2d 127, 135 (2005). Evidence of other crimes may be admitted to establish "*modus operandi*, intent, identity, motive or absence of mistake." *Id.* at 136. However, the trial court "must weigh the probative value of the evidence against its prejudicial effect, and may exclude the evidence if its prejudicial effect substantially outweighs its probative value." *People v. Moss*, 205 Ill. 2d 139, 156 (2001). Whether other-crimes evidence is admissible rests within the trial court's sound discretion, and a reviewing court will not reverse the trial court's judgment absent a clear abuse of discretion. *People v. Lovejoy*, 235 Ill. 2d 97, 135-36 (2009).

¶ 113    The State moved to admit evidence that in March 2010 Letkiewicz's neighbor Maria saw bruises on Letkiewicz's arms and hands, which were similar to the bruises seen on Letkiewicz's arms and hands on October 13, 2010. Maria asked Letkiewicz about the bruises,

and Letkiewicz told her that Feliciano "had been beating him and taking his money" and that he wanted Feliciano to leave his house but Feliciano refused. Maria spoke with her husband Francisco and Letkiewicz, and Francisco and Letkiewicz went to Letkiewicz's house and confronted Feliciano. Feliciano did not deny that he had beaten Letkiewicz but yelled, acted "in an abusive manner," stated, "[T]his is my house," and called the police. The defense raised that, once the police arrived, Feliciano was escorted out of the house but no charges were filed.

¶ 114   The court allowed the State to enter evidence that Maria saw Letkiewicz's bruises, Francisco went to Letkiewicz's house and accused Feliciano of beating Letkiewicz and taking Letkiewicz's money, and Feliciano did not deny the accusation. The trial court found that the evidence showed the "the relationship between the parties which *** apparently wasn't very good at times" and that the evidence showed Letkiewicz had sustained a similar injury.

¶ 115   Citing *People v. Denny*, 241 Ill. App. 3d 345 (1993), Feliciano asserts that this evidence was inadmissible for purposes of showing the parties' relationship. In *Denny*, the defendant was convicted for raping his ex-girlfriend at knifepoint, and the State entered evidence that the defendant had also threatened the victim with a knife eight months prior to the offense. *Id.* at 348, 353. The trial court found that the evidence of the prior incident was admissible because it showed the " 'relationship[,] familiarity, design, [and] course of conduct.' " *Id.* at 357. However, this court found that the evidence was inadmissible because it was not relevant to the disputed facts. *Id.* Specifically, the defendant only disputed whether the victim consented to the sexual activities but did not dispute that he was present at the victim's residence during the relevant time or that he engaged in sexual activities with her. *Id.* This court also rejected the State's argument that the evidence showed the defendant's intent, finding that the parties did not dispute the defendant's intent was "to be in [the victim's] residence and to engage in sexual conduct with her." *Id.* at 359.

¶ 116   *Denny* is inapplicable to this case. Here, the defense at trial presented extensive evidence that Letkiewicz may have suffered from dementia or Alzheimer's disease, claiming the dementia may have affected the accuracy of Letkiewicz's recollection when Letkiewicz stated that Feliciano entered his residence on October 13, 2010, and beat him. During closing arguments, defense counsel questioned whether Feliciano beat Letkiewicz, suggested that Letkiewicz's injuries may have simply been the result of the dresser falling on him, and also questioned whether a person hitting Letkiewicz would have intended to ultimately kill him. The defense also suggested that Letkiewicz had accused Feliciano because he was mad at Feliciano following the March 2010 confrontation. Unlike in *Denny*, evidence of Feliciano's motive and prior relationship with Letkiewicz would have been relevant for purposes of establishing material facts that were disputed by the parties. Namely, the evidence of the parties' abusive relationship leading up to October 2010 was relevant for providing context as to why Feliciano would have entered Letkiewicz's residence and beat Letkiewicz.

¶ 117   Feliciano also cites *Denny* and *People v. Puhl*, 211 Ill. App. 3d 457 (1991), as standing for the proposition that other-crimes evidence is only admissible to show the parties' prior relationship in "child sex abuse cases." Neither case set forth such a limiting rule, and the Illinois Supreme Court's holding in *People v. Illgen*, 145 Ill. 2d 353 (1991), suggests otherwise.

¶ 118   In *Illgen*, the defendant was convicted of the murder of his wife, and he testified at trial that he never pointed a firearm at his wife or intended to kill her but rather was "work[ing] the mechanism of one of his guns" when he heard a loud noise and saw that his wife had been shot. *Id.* at 359, 363. The trial court admitted evidence entered by the State of prior incidents

in which the defendant had physically abused his wife "to establish [the defendant's] motive and intent and to show that the shooting was not an accident." *Id.* at 362. On appeal, the defendant argued that the trial court erred in admitting evidence of the prior acts of abuse. *Id.* at 359.

¶ 119    The supreme court held that the evidence of prior abuse was relevant for a purpose other than to demonstrate the defendant's propensity to commit a crime; namely, it established the defendant's criminal intent. *Id.* at 366. The court reasoned that, while the shooting incident on its own may have appeared accidental, the circumstances regarding the defendant's abusive relationship with his wife "suggest that the shooting was deliberate." *Id.* The supreme court found that the prior acts of physical abuse showed that "the defendant physically assaulted his wife throughout their marriage," which "was relevant to show their antagonistic relationship and, thus, tended to establish the defendant's motive to kill her." *Id.* at 367.

¶ 120    Here, just as in *Illgen*, the defense placed into issue whether Feliciano committed the crime or intended to do so. Also, as in *Illgen*, the volatile relationship between the defendant and the victim in this case, as portrayed by the March 2010 confrontation, was relevant to the facts that were disputed at trial. Namely, evidence of Feliciano's abusive treatment of Letkiewicz and Feliciano's reliance on Letkiewicz for shelter and money was relevant to show why Feliciano would have later reentered Letkiewicz's house to take Letkiewicz's money and beat him. Due to the highly probative nature of this evidence in providing context for the October 2010 incident, we also cannot find that the evidence was more prejudicial than probative as Feliciano claims. Accordingly, we find that the "other-crimes" evidence regarding the March 2010 confrontation was admissible, as it was relevant for a "purpose other than to show the defendant's propensity to commit crimes." *Wilson*, 214 Ill. 2d at 135; see Ill. R. Evid. 401 (eff. Jan. 1, 2011) (" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").

¶ 121    Feliciano also asserts in passing that the trial court failed to provide a limiting instruction to the jury regarding how the other-crimes evidence was to be considered. However, our supreme court has specifically rejected the argument that "a proper limiting instruction must accompany the admission of other-crimes evidence," finding that, while providing a limiting instruction may be better practice, the failure to do so "does not mandate reversal." (Emphasis omitted.) *People v. Heard*, 187 Ill. 2d 36, 60-61 (1999).

¶ 122    For these reasons, we find the trial court did not abuse its discretion in admitting the "other-crimes" evidence.

¶ 123                          C. Sufficiency of the Evidence

¶ 124    Feliciano next asserts that the State failed to prove him guilty beyond a reasonable doubt of first degree murder, home invasion, and robbery.

¶ 125    The United States and Illinois Constitutions (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2) guarantee the right to due process, which "safeguards an accused from conviction except upon proof beyond a reasonable doubt of every fact necessary to prove each element that constitutes the crime charged." *People v. Murray*, 2019 IL 123289, ¶ 28 (citing *Jackson v. Virginia*, 443 U.S. 307, 315-16 (1979)). When a defendant challenges the sufficiency of the evidence at trial, "a reviewing court, considering all of the evidence in the light most favorable to the prosecution, must determine whether any rational trier of fact could have found beyond

a reasonable doubt the essential elements of the crime." *People v. Brown*, 2013 IL 114196, ¶ 48 (citing *Jackson*, 443 U.S. at 318-19). "[I]t is the responsibility of the trier of fact to fairly *** resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." (Internal quotation marks omitted.) *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009). It is also the responsibility of the trier of fact to determine "the credibility of witnesses and the weight to be given to their testimony." *People v. Jordan*, 218 Ill. 2d 255, 274 (2006). "In reviewing the evidence, this court will not retry the defendant, nor will we substitute our judgment for that of the trier of fact." *People v. McLaurin*, 2020 IL 124563, ¶ 22. "A reviewing court will not reverse a conviction unless the evidence is unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." (Internal quotation marks omitted.) *People v. Jackson*, 232 Ill. 2d 246, 281 (2009).

¶ 126    We now consider Feliciano's challenge to the sufficiency of the evidence at trial as to each separate offense for which Feliciano was convicted.

¶ 127                                1. First Degree Murder

¶ 128    Feliciano argues that the State failed to prove him guilty beyond a reasonable doubt of first degree murder because the only evidence linking him to the offense was Letkiewicz's statements but that Letkiewicz's "physical and mental infirmities at the time" left a reasonable doubt as to Letkiewicz's identification of him. Additionally, Feliciano claims the evidence did not show that the injuries Letkiewicz suffered in October 2010 proximately caused Letkiewicz's death, when Letkiewicz had multiple other health conditions that could have been intervening causes.

¶ 129    The State responds that it was the jury's role to weigh the credibility of Letkiewicz's statements and that this court should not overturn the jury's finding that Letkiewicz's identification of Feliciano as the offender was credible. Similarly, the State asserts that the jury found the State's experts more credible as to the issue of causation and that this court should not overturn the finding that Feliciano's beating of Letkiewicz in October 2010 proximately caused Letkiewicz's death.

¶ 130    Feliciano was convicted of and sentenced for first degree murder pursuant to section 9-1(a)(1) of the Criminal Code of 1961 (Code) (720 ILCS 5/9-1(a)(1) (West 2010)), which provides:

   "(a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:

      (1) he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another[.]"

¶ 131    Feliciano essentially asks this court to reweigh the expert evidence and witness credibility as was determined by the jury. He asserts that he could not have been found guilty when his conviction was primarily based on the statements of Letkiewicz prior to Letkiewicz's death.

¶ 132    However, Letkiewicz's statements were supported by a broader context linking Feliciano to the offense. Specifically, in March 2010, Letkiewicz's neighbors had seen bruises on Letkiewicz's arms while Feliciano was living in Letkiewicz's basement. One neighbor, Francisco, had confronted Feliciano about his treatment of Letkiewicz, and Feliciano had responded by stating it was his house and calling the police. In October 2010, Francisco

- 23 -

observed a broken window in Letkiewicz's basement, where Feliciano had once lived, before finding Letkiewicz under the dresser in his living room. Letkiewicz had bruises similar to the bruises seen in March 2010. This broader context, along with Letkiewicz's statements that Feliciano had beaten him and taken his money, sufficiently supported a reasonable inference that Feliciano beat Letkiewicz, and the jury was entitled to make this inference. *Siguenza-Brito*, 235 Ill. 2d at 224.

¶ 133   Moreover, the jury was not required to accept the defense's theory that Letkiewicz suffered from dementia, and we note that the defense's own experts never conclusively determined that Letkiewicz had dementia. Rather, the defense's expert, Dr. Galloucis, only left a note stating to rule out dementia on a later date.[4] Considering the consistency of Letkiewicz's statements that Feliciano beat him, the jury was not required to find that Letkiewicz had a mental disability that might have affected his recollection of the events around October 11 to 13, 2010. See *People v. Teague*, 108 Ill. App. 3d 891, 899 (1982) (noting that a jury is not required to accept the conclusions of an expert and may reach a finding by accepting lay testimony over expert testimony).

¶ 134   Feliciano also asserts that the jury improperly found that he proximately caused Letkiewicz's death.

¶ 135   "It has long been established that when the State has shown the existence, through the act of the accused, of a sufficient cause of death, the death is presumed to have resulted from such act, unless it can be shown that the death was caused by a supervening act disconnected from any act of the accused." *People v. Mars*, 2012 IL App (2d) 110695, ¶ 16 (citing *People v. Meyers*, 392 Ill. 355, 359 (1945)). To establish defendant's guilt for murder, "[i]t is not the law in this State that the defendant's acts must be the sole and immediate cause of death." *People v. Brackett*, 117 Ill. 2d 170, 176 (1987). Rather, Illinois follows a "contributing causation" approach, which is broader than "but-for causation." (Internal quotation marks omitted.) *People v. Nere*, 2018 IL 122566, ¶ 33. While " 'an intervening cause completely unrelated to the acts of the defendant does relieve a defendant of criminal liability,' " the converse is also true: " 'when criminal acts of the defendant have contributed to a person's death, the defendant may be found guilty of murder.' " *Id.* ¶ 32 (quoting *Brackett*, 117 Ill. 2d at 176).

¶ 136   Illinois courts have provided us with numerous examples of when an event may rise to the level of an "intervening cause" that relieves a defendant of criminal liability. As this court has noted, proximate cause decisions in the criminal law context typically fall into three areas: "(1) murder cases where medical negligence may have been an intervening cause [citations]; (2) driving under the influence cases where death or injury results [citations]; or (3) felony-murder cases [citations]." *People ex rel. City of Chicago v. Le Mirage, Inc.*, 2013 IL App (1st) 093547-B, ¶ 126. "If death results indirectly from a blow through a chain of natural causes, unchanged by human action, the blow is regarded as the cause of death." *Mars*, 2012 IL App (2d) 110695, ¶ 16 (citing *Meyers*, 392 Ill. at 360). Illinois courts have also found that proximate

---

[4]We note that, at the suppression hearing prior to trial, the defense called Dr. Wiacek, who testified that a July 2010 note stated Letkiewicz had some kind of dementia, but Dr. Wiacek clarified that Letkiewicz never received an actual diagnosis of dementia. Nonetheless, Dr. Wiacek's testimony was not presented at trial, and so it is not relevant to our question of whether the evidence at trial was sufficient to establish Feliciano's guilt beyond a reasonable doubt.

cause was established where a victim was shot but died of pneumonia that resulted from the injury. *People v. Gulliford*, 86 Ill. App. 3d 237, 242 (1980).

¶ 137 According to Feliciano, Dr. Goldschmidt, the State's expert who testified regarding the cause of Letkiewicz's death, failed to consider all of the "intervening causes" that led to Letkiewicz's death, namely (1) Letkiewicz's prior falls and the July 2010 car accident, which Feliciano asserts also could have caused the bleeding in Letkiewicz's brain, and (2) the other conditions Letkiewicz suffered from, including the gastrointestinal hemorrhage that Letkiewicz suffered before his death.

¶ 138 However, Feliciano overlooks the fact that Dr. Goldschmidt specifically acknowledged that he was aware of these factors. Dr. Goldschmidt simply disagreed that these factors caused Letkiewicz's death and stated that the beating Letkiewicz suffered in October 2010 set off the "deterioration" of his health, which led to his eventual death. Dr. Goldschmidt supported this assertion by observing that Letkiewicz had lived independently up until October 2010 but was unable to live independently after the beating occurred. Dr. Goldschmidt, who had performed the autopsy on Letkiewicz and examined Letkiewicz's brain firsthand, concluded that the injuries to Letkiewicz's brain had been the result of the assault and had caused Letkiewicz's death. Dr. Goldschmidt also concluded that the manner of Letkiewicz's death was homicide. The defense's expert on the matter did not clearly refute the State's expert testimony. Dr. Shuman expressly stated he could not confirm the cause of Letkiewicz's death but testified that the cause could have been heart complications or a severe gastrointestinal hemorrhage.

¶ 139 The supreme court's holding in *Brackett* is analogous. There, the defendant was charged with "rape, deviate sexual assault and aggravated battery," after he "raped and severely beat" an 85-year-old woman. *Brackett*, 117 Ill. 2d at 172-73. The victim was admitted to the hospital, and medical examinations showed "she had a broken arm, broken rib, [and] bruises on her face, neck, arms, trunk and inner thighs." *Id.* at 173.

¶ 140 A doctor testified that, prior to the incident, the victim had been a " 'feisty' old woman who lived alone and took care of herself." *Id.* During her stay in the hospital, however, the victim "became depressed and resisted efforts to feed her, and her condition progressively weakened." *Id.* The doctor also testified that over three weeks after the incident she was transferred to a nursing home and that her injuries were "healing" but she suffered from a "poor prognosis" due to the effects of trauma felt when elderly patients are removed from their homes for hospitalization. *Id.* at 174. Due to the victim's refusal to eat, the nursing home staff attempted to feed her through a nasal gastric tube, but her "nasal passages were too small, and her facial injuries made it too painful to insert." *Id.* The victim suffered from cyanosis, "a condition where the extremities turn blue and the blood pressure drops." *Id.*

¶ 141 The next day, a nurse's aide attempted to spoon-feed the victim pureed food, which the victim "accept[ed] without choking or gagging" until she spit out some vegetables, "which the aide interpreted to mean that [the victim] did not want any more." *Id.* The aide attempted to give the victim ice cream, but the victim stopped moving her mouth. *Id.* The victim was determined to have died. *Id.* The doctor who performed the victim's autopsy determined that the victim had died of asphyxiation due to "six ounces of food being aspirated into her trachea," and the volume of food lodged in the trachea was "very large" and "would have been difficult for a normal, healthy person to expel." *Id.* at 174-75. While the doctor observed that the victim had "internal abdominal bruises around the colon and kidney, a broken rib, and facial bruises," he found that "none of these injuries of themselves caused her death." *Id.* at 175.

¶ 142    The trial court in *Brackett* found that the defendant's acts were a contributing cause of the victim's death, because they "set in motion a chain of events which culminated in her death," and the appellate court affirmed the trial court's ruling on causation. *Id.* at 176. On review, the supreme court found that "the victim's depressed, weakened, debilitated state was the direct result of the trauma associated with the attack upon her, and there was uncontradicted evidence to that effect." *Id.* at 178. The court also observed that "the defendant takes his victim as he finds him" and that "a person's advanced age is as significant a part of his existing health condition as diabetes or hardening of the arteries." *Id.* at 178-79. Accordingly, the supreme court held that the trier of fact was entitled to find that the defendant "set in motion a chain of events which contributed to her death" and properly found that the defendant caused the victim's death. *Id.* at 179.

¶ 143    Here, much like the victim in *Brackett*, Letkiewicz was at an advanced age but was in generally good health and able to live independently prior to the assault. Just as the victim in *Brackett*, Letkiewicz's health took a general downturn when he was beaten and left in a severe condition with broken bones, and he was confined to assisted living after the assault. Also like the victim in *Brackett*, Letkiewicz did not die immediately but rather lived for weeks after the incident, experienced other severe health complications, and died. Just as in *Brackett*, the State's evidence here showed that the various health complications suffered by Letkiewicz were part of a general "deterioration" of Letkiewicz's health, which was set off by the injuries Letkiewicz suffered from the beating in his living room.

¶ 144    Further, the case against Feliciano was even stronger than the case against the defendant in *Brackett*. In *Brackett*, there was evidence that a nurse's aide had directly contributed to the victim's death by feeding the victim more than she could swallow, causing her to asphyxiate. *Id.* at 174-75. Here, there was no clear evidence that another person's actions directly caused Letkiewicz's death. The State's expert testified that the October 2010 assault set off the deterioration of Letkiewicz's health, a theory sufficient to establish causation according to *Brackett*. *Id.* at 176. The defense's expert witness regarding Letkiewicz's cause of death did not refute this theory but only posited that other health complications could have caused Letkiewicz's death as well. However, the jury found the State's expert more credible than the defense's, as it was entitled to do. *Jordan*, 218 Ill. 2d at 274.

¶ 145    Ultimately, Feliciano's argument is rooted in a misapplication of the causation standard used in Illinois. Illinois courts do not require a defendant to be the "sole and immediate" cause of a victim's death to support a murder conviction. *Brackett*, 117 Ill. 2d at 176. The fact that Letkiewicz may have died from a combination of other health complications does not defeat Feliciano's conviction, when Feliciano's actions caused those complications to escalate, as the State's expert opined. *Id.* Accordingly, we find the State presented sufficient evidence to support a finding that Feliciano was guilty of first degree murder beyond a reasonable doubt.

¶ 146                                    2. Home Invasion

¶ 147    Feliciano next asserts that the State failed to prove him guilty beyond a reasonable doubt of home invasion, once again based on the assertion that the State failed to establish that he entered Letkiewicz's house during the relevant time period of the incident and beat Letkiewicz.

¶ 148    Feliciano was convicted of and sentenced for home invasion pursuant to section 12-11(a)(2) of the Code (720 ILCS 5/12-11(a)(2) (West 2010)), which provides:

- 26 -

"A person who is not a peace office acting in the line of duty commits home invasion when without authority he or she knowingly enters the dwelling place of another when he or she knows or has reason to know that one or more persons is present or he or she knowingly enters the dwelling place of another and remains in such dwelling place until he or she knows or has reason to know that one or more persons is present *** and

　　　　***

　　　　(2) Intentionally causes any injury, except as provided in subsection (a)(5), to any person or persons within such dwelling place[.]"

When establishing home invasion, "knowledge may be proven by circumstantial evidence so long as the State presents sufficient evidence from which an inference of knowledge can be made." *People v. Ramey*, 240 Ill. App. 3d 456, 462 (1992).

¶ 149　As we have stated, the State presented sufficient evidence to support a reasonable inference that Feliciano had entered Letkiewicz's house in October 2010 and beaten Letkiewicz. We also find meritless Feliciano's assertion that the State failed to present sufficient evidence that Letkiewicz did not invite Feliciano into Letkiewicz's house. Given the testimony and evidence regarding (1) the prior confrontation in March 2010, in which Feliciano reacted angrily when Letkiewicz and Francisco discussed Feliciano moving out of Letkiewicz's house, (2) the broken window seen leading into the basement where Feliciano had lived, (3) the "ransacked" state of Letkiewicz's bedroom, and (4) Letkiewicz's state when Letkiewicz was found under the dresser, there was ample evidence showing that Feliciano's entrance into Letkiewicz's house was not welcome.

¶ 150　We therefore affirm Feliciano's conviction for home invasion.

¶ 151　　　　　　　　　　　　　3. Robbery

¶ 152　Feliciano also alleges that the State failed to prove him guilty of robbery, where the State failed to establish that Feliciano took anything from Letkiewicz in October 2010. The State responds again that Letkiewicz repeatedly stated that Feliciano had taken his wallet and money and that the jury found Letkiewicz's statements credible.

¶ 153　Feliciano was convicted of and sentenced for robbery pursuant to section 18-1(a) of the Code (720 ILCS 5/18-1(a) (West 2010)), which provides that "[a] person commits robbery when he or she takes property *** from the person or presence of another by the use of force or by threatening the imminent use of force." "It is well-established that in a robbery prosecution it is not necessary to prove the particular identity or value of the property taken, but it must be shown that it was the property of the victim and that it had a value." *People v. Was*, 22 Ill. App. 3d 859, 863 (1974).

¶ 154　The State presented evidence that Francisco had found Letkiewicz's bedroom in a "ransacked" state and that Letkiewicz had told Francisco and Dr. Kim that Feliciano had taken his money. The confrontation from March 2010 also provided context as to the robbery charge, as it showed the nature of the relationship between Letkiewicz and Feliciano and Feliciano's intent. Specifically, testimony regarding the confrontation allowed for an inference that Feliciano had relied on Letkiewicz for shelter and money and that Feliciano believed he was entitled to those things. As we have found, it was the jury's role to determine the credibility of the testimony regarding Letkiewicz's statements, and we cannot overturn that finding of

credibility as Feliciano requests on appeal. *Jordan*, 218 Ill. 2d at 274. Based on the evidence at trial, we find there was sufficient evidence for a trier of fact to find Feliciano guilty of robbery beyond a reasonable doubt.

¶ 155    We therefore affirm Feliciano's conviction for robbery.

¶ 156                4. Sufficiency of the Evidence Summarized

¶ 157    Despite Feliciano's suggestion that Letkiewicz suffered from dementia, the State's witnesses testified that, when Letkiewicz identified Feliciano as the one who beat him, he exhibited no signs of confusion. While Dr. Galloucis evaluated Letkiewicz in January 2010 and left a note to "rule out" dementia later, he made no conclusive finding that Letkiewicz had dementia. There was therefore sufficient evidence to allow a jury to conclude that Letkiewicz's statements were accurate. There was also sufficient evidence showing Letkiewicz did not have any mental health concerns that would have affected his recollection when he stated that Feliciano beat him in his house and took his money. The State also presented evidence that the window to the basement where Feliciano once lived was found broken on the day that Letkiewicz was recovered from under a dresser in his "ransacked" bedroom.

¶ 158    As to proximate cause, the State presented evidence that when Letkiewicz was recovered from his house on October 13, 2010, he had a broken eye socket; dried blood in his mouth; bruises on his face, hands, and arms; and hemorrhaging on his brain. He was also covered in urine and feces. After suffering those injuries, Letkiewicz was never able to live independently again, and his general physical health deteriorated until he died. The doctor who performed his autopsy concluded that Letkiewicz's cause of death was the brain hemorrhaging, as it set off the deterioration of his health, and that the manner of his death was homicide. While there was evidence that Letkiewicz suffered from other conditions, having suffered a cardiac arrest and a gastrointestinal hemorrhage, there was no conclusive evidence these conditions caused his death. We conclude that all of this evidence was sufficient to find Feliciano guilty of first degree murder, home invasion, and robbery beyond a reasonable doubt.

¶ 159                          CONCLUSION

¶ 160    For the foregoing reasons, we affirm the judgment of the trial court.

¶ 161    Affirmed.