2021 IL App (1st) 190808-U

No. 1-19-0808

Order filed November 12, 2021

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois |
| Plaintiff-Appellee, | ) | |
| | ) | |
| vs. | ) | No. 02 CR 27018 |
| | ) | |
| ANTONIO PORTER, | ) | Honorable |
| | ) | Arthur F. Hill Jr., |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE MARTIN delivered the judgment of the court.
Presiding Justice Reyes and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The circuit court did not err in dismissing defendant's second petition for relief from judgment pursuant to 735 ILCS 5/2-1401 (West 2018).

¶ 2     A jury found defendant, Antonio Porter, guilty of first degree murder and aggravated discharge of a firearm for fatally shooting Laymond Harrison on July 9, 2002. The trial court sentenced Porter to consecutive terms of 65 years' imprisonment (a 40-year sentence for first degree murder plus a 25-year enhancement because Porter personally discharged a firearm that proximately caused Harrison's death) and 6 years' imprisonment in the Illinois Department of

Corrections. On direct appeal, we affirmed Porter's convictions and sentences. *People v. Porter*, No. 1-04-2097 (2006) (unpublished order pursuant to Supreme Court Rule 23). We similarly affirmed the circuit court's denial of Porter's 2006 *pro se* petition for relief from judgment pursuant to 735 ILCS 5/2-1401 (West 2006). *People v. Porter*, No. 1-07-1920 (2008) (unpublished order pursuant to Supreme Court Rule 23). We likewise affirmed the circuit court's dismissal of Porter's 2006 initial *pro se* postconviction petition. *People v. Porter*, No. 1-07-0779 (2008) (unpublished order pursuant to Supreme Court Rule 23).

¶ 3      In 2018, Porter filed a second section 2-1401 petition for relief from judgment, which the circuit court dismissed. Defendant appeals, arguing the court erred in dismissing his petition when his newly discovered evidence—DNA analysis excluding him as a contributor to DNA profiles recovered from the currency found at the crime scene—is of such a conclusive character that it would probably change the result on retrial. For the following reasons, we affirm the circuit court's dismissal of Porter's second section 2-1401 petition.[1]

¶ 4                          I. BACKGROUND

¶ 5      On July 9, 2002, several individuals—victim Laymond Harrison, Vernon Andrews, Otis Burns, Ricky Cook, Ronald Robertson, and Kenneth Brooks—were shooting dice on the steps of an elementary school located at 7425 S. Dorchester Avenue in the city of Chicago. Evidence presented at trial established that Porter approached the group, and after Andrews vouched for him, Porter joined the dice game. A short time later, Porter suddenly displayed a handgun and stated, "You know what time it is." Porter then announced that he was going to "revenge Doogie's death." Porter pointed the handgun at Harrison and accused him of setting up Doogie, a friend of Porter's. Harrison denied the accusation, but Porter told him to "shut the f*** up." Porter then proceeded

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

to shoot Harrison in the face and three to five additional times in the body. Thereafter, Andrews, Burns, Brooks, and Cook provided the State's Attorney's office with written statements describing the events. After the police took Porter into custody, Andrews identified him as the shooter from a photographic array and at a lineup. Andrews, Burns, and Brooks subsequently testified before the grand jury and identified Porter as the shooter.

¶ 6        At trial, Andrews testified that, on the evening of July 9, 2002, he was playing a dice game with his friends Laymond Harrison, Otis Burns, Ricky Cook, Ronald Robertson, and Kenneth Brooks. Andrews testified that he could not remember specifically if somebody showed up while they were playing dice, but that many people walked up to the game. In contradiction to his written statement, Andrews asserted that a person named "Black" never approached while he was playing dice and that he never observed "Black" shoot anybody. Instead, Andrews stated he fled the scene after hearing an unidentified individual fire gunshots. Andrews stated he did not know Porter and he only picked Porter out of the lineup on September 25, 2002, and the photographic array on August 29, 2002, because, on both occasions, the police forced him to do so. Andrews testified that the police threatened to charge him with being an accessory to the murder. He further testified that his entire written statement was false, he was forced to give the statement, and he only signed it in order to go home. He subsequently stated he did not remember, or know, what he was asked in front of a grand jury and denied the veracity of his grand jury testimony.

¶ 7        After Andrews testified, Assistant State's Attorney (ASA) Athena Farmakis testified that Andrews's August 29, 2002 written statement was voluntary. Andrews's written statement, wherein Andrews stated he was playing dice at James Madison grade school at approximately 9 p.m. on July 9, 2002, was then introduced into evidence. Andrews averred he was with Harrison, Brooks, Burns, Cook, and Robinson, and aside from this group, nobody else was around. He

further stated that while they were playing dice, an African American male approached them. Andrews knew this man, by his nickname "Black," from his mom's neighborhood. From a picture attached to his statement as Exhibit 6, Andrews identified "Black" as Porter. Andrews explained that he told the other players that Porter was cool, and then Porter joined the dice game. Porter then asked, "what time is it," pointed a chrome handgun at everyone, and told them all to drop their money. Porter then began picking up the dropped money. Burns ran away from the game, and Porter turned the handgun on Harrison, while telling the group that Harrison set up "Doogie." When Harrison denied his involvement in Doogie's death, Porter shot him. Andrews stated he crouched down and heard approximately three more gunshots. He reiterated that no one else was shooting other than the man pictured in Exhibit 6. While running away from the game, Andrews heard more gunshots. Lastly, Andrews stated he had identified the shooter from the photo array, that the police officers and ASA had treated him well, and that no threats or promises had been made in exchange for his statement.

¶ 8        Chicago Police Detective Ambrose Resa testified that on August 28, 2002, he was investigating the death of Laymond Harrison. Resa stated he was present on August 29, 2002, with ASA Farmakis, when Andrews gave his written statement. Resa denied that any threatening, abusive, or coercive tactics were used to induce Andrews's statement. Rather, Resa testified that Andrews gave the statement voluntarily and was not directed who to pick from the photo array.

¶ 9        Detective Brian Johnson testified that he was working with Resa on August 28, 2002. Prior to transporting Andrews to Area 2 police headquarters[2] to discuss Harrison's murder, Johnson called Andrews's grandmother, Jewel Elam, to inform her of the investigation and to let her know Andrews was being taken to Area 2. Johnson testified that he was present on September 25, 2002

---

[2]Detective Johnson testified that Area 2 headquarters is located at 111th Street and Ellis Avenue.

when Andrews viewed a lineup and identified Porter as the man who shot Harrison during the dice game.

¶ 10 ASA Leanna Rajk testified as to the voluntary nature of Andrews's August 29, 2002 grand jury testimony. Rajk then read Andrews's grand jury testimony, in its entirety, to the jury.

¶ 11 Otis Burns testified at trial that, in the evening hours of July 9, 2002, he was hanging out on the steps of the James Madison School shooting dice. Around 11 p.m., an unidentified individual approached the dice game, shook hands with Andrews, and joined the ongoing game. After approximately 10 to 15 minutes, this individual displayed a semiautomatic handgun and said, "You know what time it is?" Burns then ran away from the game, towards 75th Street and Dorchester Avenue, where he encountered Giovanni Turnipseed. Burns informed Turnipseed that somebody was "stickin' up a dice game," and the two men went to the alley where they could see the "stick up." The men returned to the street and Burns observed that someone at the game was on their knees, while the unidentified individual stood over them, talking, and waiving something. The unidentified individual began firing gunshots and Burns then informed nearby police officers. After the individual ceased firing, the assailant ran back the way he had come. Burns pointed out the individual's path of escape to the police officers and then walked back to the school, where he observed Harrison lying on the ground.

¶ 12 On August 29, 2002, Burns spoke with police officers and gave a written statement. Contrary to his written statement, Burns averred at trial that he had not identified Porter as the shooter. Rather, Burns claimed the police asked him "who did the shooter look like," and he responded, "dark like a person like that," and he circled Porter's photograph. Burns additionally testified that the shooter was not in the courtroom. While Burns admitted speaking to the grand jury, he denied telling the grand jury that Porter was the shooter. Instead, he claimed he testified

before the grand jury that Porter looked like the shooter. When confronted with direct statements he made in front of the grand jury that implicated Porter as the shooter, Burns stated he could not remember giving those answers. On cross-examination, Burns testified he told police officers that the person who shot Harrison was a "black skinny male" who was approximately six feet, four inches tall. He further acknowledged that he identified Porter as the shooter before the grand jury, but averred he was not telling the truth, and only identified Porter in a photo array because Andrews told him Porter was the shooter.

¶ 13     After Burns testified, ASA John Maher testified as to the voluntary nature of Burns's August 29, 2002 written statement. Maher stated that Burns—after identifying Porter in a photo array as the shooter—never said that he chose Porter's picture because he simply "looked like" the shooter. Maher then read Burns's written statement aloud in its entirety. ASA Leanna Rajk testified as to the voluntary nature of Burns's August 29, 2002 grand jury testimony and confirmed several answers Burns gave in front of the grand jury.

¶ 14     Kenneth Brooks testified at trial that he was at the James Madison School on July 9, 2002, playing a dice game around 9:30 p.m., when an unidentified male approached the game. As they stopped the dice game to see who the individual was, Andrews gave the man a "voucher," thereby letting the other members of the dice game know that "he was safe." The man then joined the dice game, and after a round, Brooks simultaneously noticed that the man was picking up his money and that Burns had fled the game. Brooks then observed the unidentified man pointing a handgun towards his face. As the unidentified man held the group at gunpoint, he announced that he was not there to rob them, that Harrison knew why he was there, and that he had come to revenge "Doogie's" death. Brooks stated the unidentified man forced the group to sit in a "prisoner's position" and told Harrison "that this was for his boy Doogie." In response, Harrison said he "had

nothing to do with it." The unidentified man told Harrison to "shut the f*** up" and shot him a total of four to six times. After the second shot, Brooks ran away. As he escaped, Brooks heard six more gunshots fired in the direction he was running. Contrary to his written statement and previous identification of Porter in both a photo array and a lineup, at trial Brooks denied that Porter was the shooter. Brooks attested that he had only previously identified Porter in the photo array as someone who looked similar to the shooter. When confronted with portions of his grand jury testimony, he admitted making the prior inconsistent statements identifying Porter as the shooter but denied the veracity of those statements.

¶ 15    Ricky Cook similarly testified that on July 9, 2002, he was at James Madison School playing dice with his friends—Harrison, Burns, Brooks, Andrews, and Robinson. Shortly before 11 p.m., an unidentified man walked up to the group. After Andrews acknowledged he knew the individual, the rest of the group "paid him no attention," and he joined their dice game. Approximately 10 minutes later, the unidentified man displayed a pistol and told the group "he knew what time it was." Cook and the other players thought that this meant the man was robbing the group, so they began to give him their money. The unidentified man stated that he was not there for the dice game or their money, but had come instead for revenge against Harrison, whom he believed had gotten "Doogie" killed the year before. When Harrison attempted to respond to the accusation, the unidentified man began to shoot, and the rest of the group fled the gunshots. As Cook ran away, he heard approximately four more gunshots behind him. When Cook turned around, he observed the unidentified man jump into the back passenger side of a vehicle that then drove away.

¶ 16    In contradiction to Cook's written statement and previous identification of Porter in a photo array, Cook testified at trial that Porter was not the shooter. When confronted with his prior

inconsistent statements identifying Porter as the shooter, Cook admitted that he had made those declarations. However, Cook attested at trial that he had only picked Porter from the photo array because he did not recognize the shooter and instead picked a person with similarities to the shooter. Detective Resa testified that he was present on January 15, 2003, with ASA Denise Ambrosak and Chicago police detective Dennihan[3], when Cook viewed the photo array. Resa denied that any coercive or leading tactics were used to induce Cook's identification of Porter as the shooter.

¶ 17        Giovanni Turnipseed testified at trial for the defense. Turnipseed testified that on the night of July 9, 2002, he was on a porch at 75th Street and Dorchester Avenue, near the James Madison school. At some time between 10 and 11 p.m., Burns ran down the street towards where Turnipseed was hanging out and Burns screamed, "He got a heat, he got a heat."[4] Turnipseed asked Burns who had a handgun and Burns pointed to the school porch, where Turnipseed observed a man approximately 50 feet away. Turnipseed described this man as standing about six feet four inches, skinny, with a low haircut, and a yellowish-brown complexion. After the shooting, Turnipseed was held at the police station for 48 hours, where he relayed to police officers what he observed. On August 29, 2002, Turnipseed viewed a photo array, and appeared before the grand jury. Turnipseed did not identify anyone from the photo array. On cross-examination, Turnipseed admitted that he told detective Gurtatowski[5] that he never observed the shooter's face, as the shooter's back was facing him. Turnipseed averred that he only told Gurtatowski he had never seen the shooter's face because she kept attempting to get him to pick someone from the photo array. After further

---

[3]Detective Dennihan's first name was not provided on the record at trial.
[4]Turnipseed testified that "heat" meant a handgun.
[5]Detective Gurtatowski's first name was not provided on the record at trial.

questioning, Turnipseed admitted that he was not asked to view a photo array until August 29, 2002, and that he told Gurtatowski that he had not seen the shooter's face on July 10, 2002.

¶ 18        Ronald Robinson also testified for the defense at trial. Robinson stated he was at the school shooting dice on July 9, 2002, at approximately 10:30 or 11 p.m. when a man came from behind the school and approached the dice game. Robinson described the man as being six feet seven inches tall, with a low haircut, fade, medium complexion, and long arms. According to Robinson, the man played dice with the group for roughly 30 minutes before he displayed a firearm and pointed it at the group. The man told the group that what he was doing was between him and Harrison only, because Harrison had set up his friend and was responsible for that friend's death. Robinson observed the man shoot Harrison once before he fled the dice game. In August of 2002, Robinson was interviewed by an ASA and shown a photo array, but he did not speak to any police officers. Robinson neither identified anyone from the array, gave a written statement, nor appeared before the grand jury.

¶ 19        On cross-examination, Robinson testified that, after viewing the photo array, he told the detectives that the shooter was not depicted in the photo array. Robinson admitted he could not remember if it was in August or December of 2002 that he spoke with an ASA. Robinson conceded that he spoke to detectives Johnson and Resa and told them that he was unsure if he could identify the shooter. Detective Resa was called as a rebuttal witness and testified that he spoke with Robinson on December 9, 2002. During this meeting, Robinson told Resa that he kept his head to the ground during the altercation, he was unsure if he could identify the offender, and he was unable to describe the offender. Nonetheless, Robinson agreed to view a photo array. Upon viewing the photo array, Robinson failed to identify anyone from the array as the shooter.

¶ 20    The jury found Porter guilty of one count of first degree murder and aggravated discharge of a firearm. The trial court sentenced Porter to consecutive terms of 65 years' imprisonment (40 years for first degree murder plus a 25-year sentencing enhancement because Porter personally discharged a firearm that proximately caused Harrison's death) and 6 years' imprisonment.

¶ 21    On direct appeal, Porter argued that (1) the trial court erred in allowing the substantive admission of Vernon Andrews's grand jury testimony as a prior inconsistent statement; and (2) the statute authorizing the enhanced sentence is unconstitutional because it (a) is contrary to the public interest, (b) does not apply to his particular offense, and (c) violates the rule against double enhancement. We rejected Porter's contentions and affirmed the trial court's judgment on January 30, 2006. *People v. Porter*, No. 1-04-2097 (2006) (unpublished order pursuant to Supreme Court Rule 23). Porter petitioned for leave to appeal our decision, but it was denied by the Illinois Supreme Court on May 24, 2006. *People v. Porter*, 219 Ill. 2d 588 (2006).

¶ 22    Thereafter, in August of 2006, Porter filed a *pro se* petition for relief from judgment pursuant to 735 ILCS 5/2-1401 (West 2006), contending his convictions were void. Specifically, Porter claimed the trial court (1) had no jurisdiction to consider the sentencing enhancement factor at issue, as it was not set forth in the indictment, and (2) failed to apply Supreme Court Rule 451(g). On April 19, 2007, the State filed a motion to dismiss the 2-1401 petition, asserting it was untimely filed and failed to establish a cognizable claim for postjudgment relief. The court granted the State's motion on June 14, 2007. Porter appealed and court appointed counsel requested leave to withdraw pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987), based on her conclusion that an appeal would be without arguable merit. We affirmed the trial court's dismissal on November 7, 2008. *People v. Porter*, No. 1-07-1920 (2008) (unpublished order pursuant to Supreme Court

Rule 23). Porter petitioned for leave to appeal our decision, but it was denied by the Illinois Supreme Court on November 26, 2008. *People v. Porter*, 229 Ill. 2d 686 (2008).

¶ 23    On December 6, 2006, while his section 2-1401 petition was pending, Porter filed an initial *pro se* postconviction petition pursuant to 725 ILCS 5/122-1 (West 2006). In his petition, he argued (1) his double jeopardy rights were violated; (2) trial counsel was ineffective; (3) appellate counsel was ineffective; and (4) prosecutors used false testimony to secure his indictment. On February 8, 2007, the circuit court dismissed the petition, finding it was entirely frivolous and lacked an arguable basis in either law or fact. On April 9, 2008, we granted Porter's motion to correct the mittimus to reflect his entitlement to 449 days credit for time served and reflect that he was convicted of "aggravated discharge of a firearm." *People v. Porter*, No. 1-07-0779 (2008) (unpublished order pursuant to Supreme Court Rule 23).

¶ 24    Subsequently, on April 23, 2015, in response to the parties' agreed motion pursuant to 725 ILCS 5/116-3 (West 2014), the circuit court ordered a buccal swab for Porter. On March 21, 2016, the State explained to the court that the DNA testing was complete, but the results "were fairly inconclusive." Accordingly, the State reported to the court that the Conviction Integrity Unit of the State's Attorney's Office was going to continue its investigation. Thereafter, on August 7, 2016, the State presented an agreed order to the court seeking further DNA testing, pursuant to 725 ILCS 5/116-3, which Porter agreed to pay for. The court granted the order, allowing Bode Cellmark to test currency (E01a, E01b, and E01c)[6] recovered from the scene of the shooting and compare it to Porter's buccal swab and Harrison's blood standard.

¶ 25    Bode Cellmark submitted a forensic case report on January 9, 2018, detailing the results of its DNA testing. Bode Cellmark determined that the partial DNA profile obtained from sample

---

[6]Three five-dollar bills were recovered from the crime scene—two, covered in blood, were labeled as Samples E01a and E01b, and the third bill, found in a different location, was labeled as Sample E01c.

E01a is consistent with a mixture of at least two individuals, including a major male contributor that matched Harrison's DNA profile. Porter is excluded as a possible contributor of the major component DNA profile in E01a, although no conclusions could be made on the minor alleles present "due to the possibility of allelic drop out." The DNA profile obtained from sample E01b is consistent with Harrison's DNA profile, and Porter is therefore excluded as a possible contributor of that DNA profile. The partial DNA profile obtained from sample E01c is consistent with a mixture of three or more individuals, including at least one male contributor. However, due to the possibility of allelic drop out, no conclusions could be made on the mixed DNA profile.

¶ 26 Porter, seeking a second opinion on the DNA analysis, hired Karl Reich, Ph.D. at Independent Forensics DNA Testing and Technologies. On April 4, 2018, Reich submitted a "detailed and critical analysis" of the DNA testing performed by Bode Cellmark. In that analysis, Reich—who did not himself conduct any independent testing on the samples—determined that Harrison was clearly the major male contributor to the DNA profile obtained from sample E01a. Reich, finding it was debatable that there were two contributors to E01a, nonetheless excluded Porter as a possible contributor from both the major and the potential minor contributor. Upon analyzing Bode Cellmark's testing of sample E01b, Reich determined the single DNA profile belonged to Harrison; Porter was excluded as a contributor. Reich next turned to analyzing sample E01c, finding that, while the "locus is not terribly informative," he could deduce that at least one male DNA profile is present in the sample. Ultimately, Reich concluded that his analysis strongly supported that Porter was eliminated as a contributor to sample E01C and that Harrison was a contributor.

¶ 27 Thereafter, Porter, through counsel, filed a petition for relief from judgment pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2018)) on April 20,

2018. Porter argued that newly discovered evidence—Reich's analysis of the DNA results from the currency recovered at the crime scene—is of such a conclusive character that it would probably change the result on retrial. Specifically, Porter argued that, given the weakness of the evidence at trial, the DNA test results which excluded him as a contributor from the bills left by the perpetrator undermines confidence in the verdict.

¶ 28        On August 15, 2018, the State filed a motion to dismiss Porter's section 2-1401 petition, pursuant to 735 ILCS 5/2-615, 2-619.1 (West 2018). In its motion, the State argued that the petition was legally insufficient, in that it failed to state under which paragraph of section 2-1401 it was being filed. The State further contended that (1) the evidence Porter relies upon is not newly discovered, (2) Porter acted negligently and failed to demonstrate due diligence, and (3) the DNA testing is merely cumulative, is not material, and is not so conclusive that it would probably change the outcome on retrial. Lastly, the State alleged Porter's petition was beyond the two-year statute of limitations for filing a section 2-1401 petition.

¶ 29        Subsequently, on December 21, 2018, Porter filed, through counsel, a reply to the State's motion to dismiss. Within his reply, Porter explained that the two-year statute of limitations for filing a section 2-1401 petition does not apply where, as here, the petition is based on postconviction DNA results. Porter further alleged that his petition was not subject to dismissal because there was no requirement that he specify under which paragraph of section 2-1401 he is proceeding. Lastly, Porter claimed (1) the DNA testing was properly ordered pursuant to 725 ILCS 5/116-3 and the results are newly discovered for purposes of a section 2-1401 petition, (2) the evidence is material and noncumulative, and (3) where, as here, the evidence at trial only weakly supports a defendant's guilt, then exculpatory DNA results are far more likely to undermine confidence in the outcome of the trial.

¶ 30    On January 7, 2019, the State filed a reply to Porter's response to their motion to dismiss. The State alleged that Porter failed to meet the standards required by *People v. Davis*, 2012 Ill. App. (4th) 110305, in that Porter did not demonstrate he exercised due diligence in ascertaining his rights and acting upon them within an appropriate time frame. Additionally, the State argued that Porter was not excluded from Bode Cellmark's testing, and Reich's analysis is not the newly discovered evidence that section 2-1401(c) contemplates. 735 ILCS 5/2-1401 (West 2018). In conclusion, the State argued that Porter has failed to show that (1) Bode Cellmark's extraction of partial DNA profiles from the recovered currency could not have been conducted in 2003 at the time of Porter's trial, and (2) the evidence is material, noncumulative, and of such a conclusive character that it would likely change the results of a retrial.

¶ 31    The circuit court heard argument on the State's motion to dismiss Porter's petition on February 4, 2019. The circuit court granted the State's motion to dismiss Porter's petition on March 14, 2019, finding that—as nobody can say the tested currency came from the shooter or was handled by the shooter—it cannot be said that there is a great likelihood that the outcome on retrial would be any different. Following denial of his motion to reconsider, Porter filed a timely notice of appeal on April 5, 2019.

¶ 32                                    II. ANALYSIS

¶ 33    As a preliminary matter, Porter, in his reply brief, requests that we consider striking or disregarding the facts statement from the State's appellee brief. According to Porter, the State fails to substantially conform to Illinois Supreme Court Rule 341(h)(6) and its fact section is such "an astonishingly deceptive and egregious whitewashing of the testimony at trial," that we would be justified in striking the State's brief in its entirety. Ill. S. Ct. R. 341(h)(6) (eff. Oct. 1, 2020).

Specifically, Porter claims the State blatantly mischaracterizes Vernon Andrews's testimony, and distorts the testimony of the other eyewitnesses.

¶ 34    The Illinois Supreme Court's rules governing appellate briefs are mandatory. *Slater v. Illinois Labor Relations Board, Local Panel*, 2019 IL App (1st) 181007, ¶ 7. "A party's failure to comply with the rules runs the risk that this court will strike the offending portions of a noncompliant brief, or in rare cases, dismiss an appeal for serious rule violations." *Metzger v. Brotman*, 2021 IL App (1st) 201218, ¶ 24. However, striking an appellate brief, in whole or in part, is a harsh sanction that "is ordinarily reserved for the most egregious failures to comply with the rules and those that hinder our review." *In re Marriage of Reicher*, 2021 IL App (2d) 200454, ¶ 30 (citing *Hall v. Naper Gold Hospitality,* LLC, 2012 IL App (2d) 111151, ¶ 15). A statement of facts is not required pursuant to supreme court rules, but if an appellee chooses to include such a statement, they must follow Rule 341. Ill. S. Ct. R. 341(h)(6).

¶ 35    We have considered Porter's invitation to strike, and decline to strike either the State's statement of facts or the State's brief in its entirety, finding that the statement of facts comports with Rule 341(h)(6), in that the facts are stated accurately and fairly, with appropriate reference to the pages of the record on appeal. *Id.* To the extent that either party's brief contains what we deem to be an inaccurate statement of facts, we will disregard those improprieties without striking them from the briefs. We now turn to the merits of the appeal.

¶ 36    On appeal, Porter contends the circuit court erred in dismissing his petition when his newly discovered evidence excluded him from the DNA found on three separate $5 bills recovered from the scene of the shooting and the State's case at trial was "exceedingly weak." The State argues the court's ruling was proper where Porter understates the compelling evidence of his guilt and overstates the utility of the DNA analysis conducted by Karl Reich—the results of which the State

contends were neither material to petitioner's claim, nor sufficiently conclusive to undermine the verdict. Porter counters that he established, by a preponderance of the evidence, that the exclusionary DNA is material and conclusive enough to warrant relief.

¶ 37          Section 2-1401 of the Illinois Code of Civil Procedure provides a comprehensive statutory procedure that allows for a movant to petition for relief from a final order or judgment after 30 days following its entry. 735 ILCS 5/2-1401(a) (West 2018). Although a section 2-1401 petition provides a civil remedy, relief under this section also extends to criminal cases. *People v. Abdullah*, 2019 IL 123492, ¶ 13. A defendant in a criminal case may seek " 'to correct all errors of fact occurring in the prosecution of a case that were unknown to the petitioner and the court at the time of trial, which, if then known, would have prevented the judgment from being entered.' " *People v. Moore*, 2012 IL App (4th) 100939, ¶ 26 (quoting *People v. Thomas*, 364 Ill. App. 3d 91, 98 (2006)). Generally, a section 2-1401 petition must not be filed later than 2 years following the entry of the order or judgment. 735 ILCS 5/2-1401(c) (West 2018). However, that time limitation does not apply when, as here, the petition is brought pursuant to Section 116-3 of the Illinois Code of Criminal Procedure. *Id.*; 725 ILCS 5/116-3 (West 2018).

¶ 38          While the petition must be filed in the same proceeding as the challenged judgment, it is a separate action subject to the usual rules of civil procedure, and not a continuation of the original action. 735 ILCS 5/2-1401(b) (West 2018); *Abdullah*, 2019 IL 123492, ¶ 13 (quoting *People v. Shinaul*, 2017 IL 120162, ¶ 8). A petition must be supported by affidavit or other appropriate showing as to matters not of record. 735 ILCS 5/2-1401(b) (West 2018). To obtain relief under section 2-1401, a defendant is required to show, by a preponderance of the evidence, (1) the existence of a meritorious claim, (2) due diligence in presenting it, and (3) due diligence in filing the petition. *People v. Cathey*, 2019 IL App (1st) 153118, ¶ 23; *People v. Vincent*, 226 Ill. 2d at

7-8. As "[s]ection 2-1401 petitions are essentially complaints inviting responsive pleadings," the petition is subject to dismissal for either factual or legal insufficiency, such as a failure to state a meritorious claim or defense. *People v. Vincent*, 226 Ill. 2d 1, 8 (2007). When evaluating a motion to dismiss, the court will construe the complaint in the light most favorable to the nonmoving party, accept all well-pleaded facts as true, and draw all inferences in the nonmoving party's favor. *Jane Doe-3 v. McLean County Unit. Dist. No. 5 Bd. of Directors*, 2012 IL 112479, ¶ 16. Where a material issue of fact is disputed, an evidentiary hearing should be held before the trial court rules on the petition. *LVNV Funding, LLC v. Trice*, 2011 IL App (1st) 092773, ¶ 8, *abrogated by LVNV Funding, LLC v. Trice*, 2015 IL 116129.

¶ 39     When, as in the present case before us, the section 2-1401 petition relies on new evidence to justify a new trial, the new evidence must (1) have been discovered since trial; (2) be of such a character it could not have been discovered before trial exercising due diligence; (3) material to the issue, rather than merely cumulative; and (4) of such conclusive character that it will probably change the result on retrial. *Cathey*, 2019 IL App (1st) 153118, ¶ 46 (citing *People v. Waters*, 328 Ill. App. 3d 117, 127 (2002)). As laid out by our supreme court, "[m]aterial means the evidence is relevant and probative of the petitioner's innocence. [Citation.] Noncumulative means the evidence adds to what the jury heard. [Citation.] And conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result. [Citation.]" *People v. Coleman*, 2013 IL 113307, ¶ 96. Specifically, a defendant must prove that new DNA evidence is so conclusive that it, when considered along with the trial evidence, would probably lead to a different result. *Id.*; *People v. Robinson*, 2020 IL 123849, ¶ 48 ("Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence."). Furthermore, "[w]hen a section

2-1401 petition is filed and the new evidence to be considered is DNA testing results, the trial court must consider the trial evidence in light of the new DNA results to determine whether they are so conclusive as to warrant a new trial." *People v. Davis*, 2012 IL App (4th) 110305, ¶ 27 (citing *People v. Dodds*, 344 Ill.App.3d 513, 523 (2003)).

¶ 40    The State argues, and Porter concedes in his reply brief, that we should employ an abuse of discretion standard in considering the lower court's errors, with regards to the materiality and conclusiveness of the new evidence. A section 2-1401 petition can present either a factual or legal challenge to a final judgment or order, and "the nature of the challenge presented in a section 2-1401 petition is critical because it dictates the proper standard of review on appeal." *Warren County Soil and Water Conservation District v. Walters*, 2015 IL 117783, ¶ 31. Where a section 2-1401 petition is denied on purely legal grounds, the standard of review is *de novo*. *Abdullah*, 2019 IL 123492, ¶ 13. *De novo* means we analyze the petition's claims the same as a trial court would. *People v. Parada*, 2020 IL App (1st) 161987, ¶ 18. Conversely, "a section 2-1401 petition that raises a fact-dependent challenge to a final judgment or order must be resolved by considering the particular facts, circumstances, and equities of the underlying case." *Walters*, 2015 IL 117783, ¶ 50. In such circumstances, as is the case here, we review the circuit court's order for abuse of discretion under the standards set forth by our supreme court in *Smith v. Airoom, Inc.*, 114 Ill. 3d 209 (1986). A trial court abuses its discretion only when (1) its decision is arbitrary, fanciful, or unreasonable, or (2) no reasonable person would take the view adopted by the court. *People v. Towns*, 2020 IL App (1st) 171145.

¶ 41    In the present case, the circuit court denied Porter's section 2-1401 petition after hearing argument on the State's motion to dismiss, finding that—as nobody could identify who the tested

currency came from or who may have touched it—Porter failed to make a showing that the DNA evidence was of such a conclusive nature that it would likely change the outcome on retrial.

¶ 42    On appeal, the parties agree that Porter met his burden to present new, noncumulative evidence. They disagree on whether it was material and so conclusive that, when considered along with the trial evidence, it would probably lead to a different result on retrial. Porter argues the circuit court abused its discretion in dismissing his petition since "there was no dispute among the eyewitnesses that the offender was the last person who touched the five-dollar bills," and the absence of Porter's DNA on the money is material and has sufficient probative force or weight to produce a different result on retrial. Moreover, Porter claims the circuit court failed to consider two-thirds of his exclusionary DNA evidence and misunderstood Reich's analysis. Porter further argues that an evidentiary hearing is required where there are lingering questions regarding (1) whether the bills tested were handled by the shooter and (2) the likelihood of the shooter leaving his DNA on the bills handled.

¶ 43    The State responds that Porter did not prove his case because the DNA analysis was not exculpatory and was immaterial to the issue of whether Porter fatally shot Harrison. Specifically, the State argues there is no evidentiary nexus between Harrison's murder and the currency scattered at the scene. The State asserts that the circuit court did not abuse its discretion where the DNA analysis does not provide a "different" or "probative" factual framework from which to assess the eyewitness accounts of the shooting.

¶ 44    Initially, it should be noted that Porter was not convicted based upon any biological evidence that tied him to Harrison's shooting. Rather, Porter was convicted based upon multiple pretrial identifications by eyewitnesses who observed the shooting. Four eyewitnesses (Andrews, Burns, Brooks, and Cook) identified Porter as the person who shot Harrison in statements made to

police officers and ASAs. Three of those witnesses then repeated this identification before a grand jury. While currency was discussed tangentially in all these statements, it was not discussed as germane to the identity of the shooter.

¶ 45        Despite Porter's attestations that "there is simply no reason for the court's flat-out rejection of the high likelihood that the money recovered at the crime scene was the money that the shooter scooped up and then dropped as he fled the scene," there are several other possible explanations for the origins of the money recovered. The money may have fallen out of the player's hands or pockets as they fled the scene. As the participants were playing a betting game, it is reasonable that money other than what was wagered may have been present (whether this money was present in the players' pockets, wallets, or some other location). Alternatively, Burns and the other eyewitnesses testified at trial that Burns ran as soon as he saw the handgun from the corner of his eye. It is conceivable that the money could have fallen from Burns's hands or pockets as he ran from the scene. Furthermore, at trial, both Brooks and Cook testified that the shooter specifically announced that he did not care about the dice game, and he was not robbing them. That testimony directly rebuts Porter's contention that the shooter gathered all the currency prior to the shooting.

¶ 46        Porter further argues that he has presented newly discovered evidence "which contradicts a witness by showing facts." Contrary to Porter's claims, the DNA analysis conducted by Reich does not contradict the testimony of any witness. No testimony was elicited at trial that the shooter grabbed every item of currency present at the game, nor did anyone testify that the offender was the last person to touch the currency. Likewise, there was no testimony from anyone at trial that otherwise connected the recovered money directly to the shooter.

¶ 47        Even assuming every single bill was touched by the shooter, despite the lack of corroborating testimony that this was the case, touching an object does not guarantee transfer of

DNA. "Touch DNA refers to the genetic information recovered from epithelial (skin) cells left behind when a person makes contact with an object. During the commission of a crime, an assailant can leave touch DNA samples behind when he or she has used a large amount of force, which deposits cells on a victim's clothing or other items implicated in the crime." Victoria Kawecki, Comment, *Can't Touch This? Making a Place for Touch DNA in Post-Conviction DNA Testing Statutes*, 62 Cath. U. L. Rev. 821, 828-29 (2013). Here, there was no testimony provided at trial that established the connection between the recovered currency and the shooter. Moreover, the elicited testimony which did establish that the shooter "scooped" up some of the currency, cannot establish that the shooter left any DNA evidence on the bills. *Cf. People v. Smith*, 2014 IL App (1st) 113265. Unlike the testimony that the shooter in *Smith* wore a sweatshirt and gloves that were later found in the defendant's possession, there was no testimony presented at Porter's trial that insinuated the shooter here had prolonged contact with the currency that was recovered.

¶ 48        In fact, Reich's own analysis of the recovered DNA stated that he believed sample E01a had only one DNA contributor, that of victim Harrison. He further concluded that there was only one single DNA profile in sample E01b, and that too was Harrison's. Therefore, by Porter's expert's own concession, the shooter's DNA was not collected from either samples E01a or E01b. The fact that Porter was excluded from the DNA profiles found on the three recovered $5 bills does not establish that he did not commit the shooting. Harrison's DNA was the only DNA profile obtained from two of the three $5 bills. This further supports the proposition that even a complete exclusion of Porter's DNA from an item unrefutably touched by the shooter does not preclude a finding that Porter was the shooter. Moreover, "[t]he lack of physical evidence in a case does not raise a reasonable doubt where an eyewitness has positively identified the defendant as the perpetrator of the crime." *People v. Reed*, 396 Ill. App. 3d 636 (2009). Even accepting Porter's

proposition that the shooter touched every single bill present at the dice game, and Porter's DNA was not found on the recovered bills, it does not support his position that the DNA analysis is so conclusive that it, when considered along with the trial evidence, would probably lead to a different result.

¶ 49       Porter emphasizes that this was a closely balanced case that strongly suggests wrongful identification. In support of this argument, Porter maintains that the eyewitnesses' trial testimonies should be viewed more favorably than the disavowed pretrial statements the eyewitnesses made. While Porter relies heavily on the contemporaneous recantations of the eyewitnesses at trial to prove the State's case at trial was "stunningly weak," this is not new evidence or information. Moreover, our supreme court has repeatedly ruled that recantations are inherently unreliable. *People v. Steidl*, 142 Ill. 2d 204 (1991); see also *People v. Marquis*, 344 Ill. 261, 265 (1931) ("Recanting testimony is regarded as very unreliable"); *People v. Sanders*, 2016 IL 118123, ¶ 33 ("It is true that recantation testimony is regarded as inherently unreliable"); *People v. Shaw*, 2019 IL App (1st) 152994, ¶ 72 ("recantation testimony is inherently unreliable"). Indeed, the jury heard the recantations, and the subsequent impeachments of each witness, and decided the recantations were not reliable. It is well settled that it is "the responsibility of the trier of fact to determine 'the credibility of witnesses and the weight to be given to their testimony.' " *People v. Feliciano*, 2020 IL App (1st) 171142, ¶ 125 (quoting *People v. Jordan*, 218 Ill. 2d 255, 274 (2006)). The jury here rejected the eyewitnesses' in-court testimony, choosing instead to credit (1) the witnesses' pretrial statements and grand jury testimonies, and (2) the police detectives and ASAs who testified the eyewitnesses' statements were given voluntarily and not under any sort of duress.

¶ 50       Porter next contends that the police officers who testified at trial had a strong incentive to deny misconduct regarding the eyewitnesses' "dubious" pretrial identifications of Porter. He

argues that while a jury in 2003 may not have believed that police officers would manipulate a witness to secure a conviction, it is much more likely that a jury now would have a different understanding. Of note, Porter did not then, nor does he now, offer any evidence supporting the assertion that the eyewitnesses were manipulated by corrupt police officers. Porter further contends that a modern retrial could also include the now-widely accepted social science research regarding how susceptible identifications are to influence and taint. Neither of these arguments was raised in Porter's section 2-1401 petition before the circuit court. Rather, these are arguments Porter raises for the first time on appeal. Arguments may not be raised for the first time on appeal. *People v. Estrada*, 394 Ill. App. 3d 611, 626 (2009). As such, we decline to address these claims.

¶ 51    Lastly, contrary to Porter's assertions, the circuit court did not erroneously limit its analysis to one exclusionary DNA result—sample E01c. Rather, the circuit court mentioned that three separate $5 bills were recovered by the police after the shooting and all three of those bills were tested for DNA by Bode Cellmark. The court then focused its explanation on sample E01c, recognizing that although there was a partial DNA profile recovered from this bill, it did not match Harrison's DNA (unlike the profiles recovered from samples E01a and E01b). Furthermore, contrary to Porter's argument, there were no issues of fact regarding the testing results, where the court specifically noted that Reich excluded Porter from the DNA profile recovered from sample E01c. As there were no doubts regarding the testing results, no evidentiary hearing was necessary. As such, the court's decision not to grant an evidentiary hearing was not an abuse of discretion.

¶ 52    For these reasons, we find Porter's petition was properly dismissed where Porter failed to show that his new evidence (Reich's DNA analysis) was material and so conclusive that it, when considered along with the trial evidence, would probably lead to a different result.

¶ 53                                    III. CONCLUSION

¶ 54          Based on the foregoing, we conclude the circuit court did not abuse its discretion when it

denied Porter's section 2-1401 petition. Accordingly, we affirm the circuit court's ruling granting

the State's motion to dismiss Porter's petition.

¶ 55          Affirmed.